**Edward M. KENNEDY**

v.

**Arthur F. SAMPSON, Acting Administrator, General Services Administration, et al., Appellants (two cases).**

**Nos. 73-2121 and 73-2122.**

United States Court of Appeals, District of Columbia Circuit.

Argued May 31, 1974.

Decided Aug. 14, 1974.

---

12. Two of the five members of the Board dissented.

James C. Hair, Jr., Atty., Dept. of Justice, with whom Irving Jaffe, Acting Asst. Atty. Gen., Earl J. Silbert, U. S. Atty. and Robert E. Kopp, Atty., Dept. of Justice, were on the brief for appellants. Morton Hollander, Atty., Dept. of Justice, also entered an appearance for appellants.

Edward M. Kennedy, appellee, pro se.

Before BAZELON, Chief Judge, FAHY, Senior Circuit Judge, and TAMM, Circuit Judge.

TAMM, Circuit Judge.

Appellee, a United States Senator, filed suit against the Administrator of the General Services Administration and the Chief of White House Records seeking a declaration that the Family Practice of Medicine Act (hereinafter, S. 3418)[1] became law on December 25, 1970, and an order requiring the appellants to publish the Act as a validly enacted law.[2] S. 3418 was passed by overwhelming majorities in both the House and Senate in the Fall of 1970.[3] Appellee was among those Senators who voted in favor of the bill which was presented to the President on December 14, 1970.[4] On December 22 both Houses of Congress adjourned for the Christmas holidays, the Senate until December 28 and the House until December 29.[5] Before adjourning, the Senate authorized the Secretary of the Senate to receive messages from the President during the adjournment.[6] On December 24, the President issued a memorandum of disapproval announcing that he would withhold his signature from S. 3418.[7] The President took no further action with respect to the bill. Appellants maintain that this series of events resulted in a "pocket veto" under article I, section 7 of the United States Constitution. Appellee, relying upon the same provision, contends that the bill became law without the President's signature at the expiration of the ten-day period following its presentation to him.

Upon cross motions for summary judgment, the district court granted judgment in favor of appellee. The order of the district court declares that S. 3418 became a law of the United States on December 25, 1970 and that "defendants are under a ministerial, nondiscretionary duty to publish said law . . . ."[8] Although the district court has retained jurisdiction for the purpose of adjudicating appellee's request for injunctive relief in the nature of a mandamus, further action has been postponed pending this appeal.[9]

Two questions are presented for review: (1) does appellee have standing to maintain this suit; and (2) did S.

---

1. S. 3418, 91st Cong., 2d Sess. (1970).

2. Appellee contends that appellant Jones is required to deliver and appellant Sampson to publish in slip form and in Statutes at Large all newly enacted laws of the United States. Kennedy v. Sampson, C.A. No. 1583–72, Complaint, ¶¶ 4, 5 (D.D.C., filed Aug. 9, 1972), *citing* 1 U.S.C. §§ 106a, 112, 113 (1970). This question was not decided by the district court.

3. Passed in the Senate September 14, 1970 by a vote of 64–1, 116 Cong.Rec. 31508 (1970); in the House of Representatives on December 1, 1970 by a vote of 346–2, *id.* at 39379. The Senate House Conference Report, H.R. Rep.No.91–1668, 91st Cong., 2d Sess., was agreed to by the House on December 8, 116 Cong.Rec. 40289–92 (1970), and by the Senate on December 10, *id.* at 40867.

4. 116 Cong.Rec. 41289 (1970).

5. S.Con.Res. 87, 91st Cong., 2d Sess., *id.* at 43250.

6. 116 Cong.Rec. 43221 (1970).

7. 6 Presidential Documents 1726–27 (December 28, 1970).

8. Kennedy v. Sampson, 364 F.Supp. 1075, 1087 (D.D.C.1973).

9. Pursuant to Rule 54(b), Fed.R.Civ.P. the district court found that there was no just reason for delay and directed entry of a final order granting appellee's request for declaratory relief. Kennedy v. Sampson, *supra* note 2, Order dated September 24, 1973.

3418 become a law? We conclude that both questions must be answered in the affirmative.

## I.

■ The requirement of standing derives from the limitation upon judicial power expressed in the "case" or "controversy" formula of article III of the Constitution. The concept was recently treated by the Supreme Court in Sierra Club v. Morton, 405 U.S. 727, 731–732, 92 S.Ct. 1361, 1364, 31 L.Ed.2d 636 (1972):

> Whether a party has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy is what has traditionally been referred to as the question of standing to sue. Where the party does not rely on any specific statute authorizing invocation of the judicial process, the question of standing depends upon whether the party has alleged such a "personal stake in the outcome of the controversy," Baker v. Carr, 369 U.S. 186, 204 [82 S.Ct. 691, 703, 7 L.Ed.2d 663] as to ensure that "the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution." Flast v. Cohen, 392 U.S. 83, 101 [88 S.Ct. 1942, 1953, 20 L.Ed.2d 947].

Although he has not been authorized to prosecute this suit on behalf of the Senate or the Congress, appellee offers several alternative theories of standing.[10] We agree with the district court that appellee has standing to maintain this suit in his capacity as an individual United States Senator who voted in favor of S. 3418. This conclusion follows from any of the traditional methods of evaluating the standing of a party to sue.

One approach to the question is to inquire whether a "logical nexus" exists between the status asserted by a litigant and the claim sought to be adjudicated.

Flast v. Cohen, 392 U.S. 83, 102, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). Examination of appellee's complaint reveals that such a nexus is present in this case. While the complaint is literally addressed to the ministerial duties of certain officials, the legal issue turns on the validity of executive action which purports to have disapproved an Act of Congress by means of a constitutional procedure which does not permit Congress to override the disapproval. If appellants' arguments are accepted, then appellee's vote in favor of the bill in question has been nullified and appellee has no right to demand or participate in a vote to override the President's veto. Conversely, if appellee's interpretation of the veto clause is correct, then the bill became law without the President's signature. In short, disposition of the substantive issue will determine the effectiveness *vel non* of appellee's actions as a legislator with respect to the legislation in question. This demonstrates a relationship between appellee and his claim which is not only "logical" but real, a relationship which assures that the issues have been litigated with the vigor and thoroughness necessary to assist the court in rendering an informed judgment.

■ A somewhat different analysis of standing has been employed with respect to parties who challenge administrative action. In Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) the Supreme Court framed the standing issue as follows: (1) does the plaintiff allege that the challenged action has caused him "injury in fact, economic or otherwise;" (2) is the interest sought to be protected "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Id.* at 152–153, 90 S.Ct. at 830. Appellee's pleading satisfies both inquiries. The

---

10. Appellee claims standing in his capacity as a citizen, as a taxpayer, and as a member of the United States Senate. The district court agreed with the latter contention and did not reach the alternative arguments. Kennedy v. Sampson, *supra*, 364 F.Supp. at 1077–1079.

complaint alleges an injury to him in his capacity as a United States Senator:

> The acts of the defendants have injured the plaintiff as a United States Senator by denying him the effectiveness of his vote as a member of the United States Senate. The plaintiff . . . was among 64 Senators voting in favor of S. 3418 . . . .[11]

Appellee's asserted interest plainly falls among those contemplated by the constitutional provision upon which he relies. That provision, article I, section 7, is one of several in the Constitution which implement the "separation of powers" doctrine. Taken together, these provisions define the prerogatives of each governmental branch in a manner which prevents overreaching by any one of them. The provision under discussion allocates to the executive and legislative branches their respective roles in the law-making process. When either branch perceives an intrusion upon its legislative power by the other, this clause is appropriately invoked. The gist of appellee's complaint is that such an intrusion has occurred as a result of the President's misinterpretation of this clause and that a consequence of this intrusion is the nullification of appellee's vote in favor of the bill in question; hence, the complaint alleges injury to an interest of appellee as a member of the legislative branch of the government, an interest among those protected by article I, section 7. Appellants insist that only the interests of the Congress or one of its Houses as a body are protected by this provision. This contention is treated below in the discussion of the *Coleman* decision.

Our conclusion with respect to appellee's standing finds support in Coleman v. Miller, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939), which held, *inter alia,* that twenty state senators who had voted against ratification of a constitutional amendment had standing to challenge the legality of a tie-breaking vote in favor of ratification which was cast by the Lieutenant Governor, the presiding officer of the Senate of Kansas. The Court concluded that the interest of the legislators in protecting the effectiveness of their votes conferred standing to maintain the suit:

> Here, the plaintiffs include twenty senators, whose votes against ratification have been overridden and virtually held for naught although if they are right in their contentions their votes would have been sufficient to defeat ratification. We think that these senators have a plain, direct and adequate interest in maintaining the effectiveness of their votes.

*Id.* at 438, 59 S.Ct. at 975. Appellants correctly point out that the votes of the twenty plaintiffs in *Coleman* had peculiar legal significance *as a bloc, i. e.:* these votes were sufficient to prevent ratification absent the challenged vote of the Lieutenant Governor. Appellants read *Coleman* as holding that the plaintiff legislators had standing only as a group for the purpose of protecting the collective effectiveness of their votes. In a like vein, appellants contend that appellee's vote in favor of S. 3418 has no legal significance independent of the other votes in favor of the bill. Any injury to him occasioned by the President's action, it is argued, is "derivative" in nature.[12] In appellants' view, only the Senate or the Congress has sustained the "direct" injury necessary to confer standing (assuming that the veto of S. 3418 was invalid).[13]

11. Kennedy v. Sampson, *supra* note 2, Complaint, ¶ 15.

12. Appellants' Br. at 24–27; Appellants' Reply Br. at 2–3.

13. Appellants' Reply Br. at 2. Appellants suggest that the Senate might have standing because it was "improperly deprived of the initial opportunity to override the veto . . . . " *Id.* Appellee makes a similar argument in favor of his own individual standing. Appellee's Br. at 13. Both parties misconceive the issue. The only possible effects of the President's action with respect to S. 3418 are that the bill became law, in which case there is no need to override, or it

■ The *Coleman* opinion neither confirms nor rejects appellants' interpretation. It does not express reliance upon the fact that all nay-voters had joined as plaintiffs in the action, nor does it contain any hint as to whether one of the plaintiffs might have maintained the suit alone. Although references to the parties and their votes are, quite naturally, in the plural form, the opinion does not disclose whether the Court was considering them collectively or severally. In light of the purpose of the standing requirement, however, we think the better reasoned view of both *Coleman* and the present case is that an individual legislator has standing to protect the effectiveness of his vote with or without the concurrence of other members of the majority.

The policy underlying the doctrine of standing is identified in the following passage from Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962):

> Have the appellants alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for the illumination of difficult constitutional questions? This is the gist of the question of standing.

Another discussion describes the purpose of the standing doctrine as follows:

> Under such circumstances, we feel confident that the questions will be framed with the necessary specificity, that the issues will be contested with the necessary adverseness and that the litigation will be pursued with the necessary vigor to assure that the constitutional challenge will be made in a form traditionally thought to be capable of judicial resolution.

did not become law because Congress prevented its return, in which case there is no right to override. *See* Hearings on the Constitutionality of the President's "Pocket Veto" Power Before the Subcomm. on Separation of Powers of the Senate Comm. on the Judiciary, 92nd Cong., 1st Sess. 4–5 (1971).

Flast v. Cohen, *supra,* 392 U.S. at 106, 88 S.Ct. at 1955. Appellee's interest in the present controversy provides the same assurance that he is an appropriate advocate.

■ Appellants' argument to the contrary is based upon a distinction which is more formal than substantive. While conceding that Congress as a whole (or even one of its Houses) has standing to challenge the President's purported use of the pocket veto,[14] appellants insist that an individual member of Congress does not, even if he voted for the bill in controversy. The interest of the Congress in preserving its role in the lawmaking process is said to be "direct" while that of appellee is labelled "indirect or derivative."[15] Appellants base this distinction upon the self-evident proposition that appellee is not the Congress:

> As an individual senator appellee can at best be said to have sustained only indirect injury as the result of the pocket veto, *for his vote for S. 3418 is in no sense the legal or political equivalent of the passage of the bill by the Congress. . . .*[16]

The italicized observation is undoubtedly correct but it does not help appellants' argument. The prerequisite to standing is that a party be "among the injured," in the words of *Sierra Club*, not that he be the *most* grievously or *most* directly injured. We think that appellee is "among the injured" in this case.

The subject matter at stake in this litigation is legislative power. The court is presented with conflicting views of the pocket veto power, one which is expansive, and another which is restrictive. Over the long term, appellants' broad view of the pocket veto power threatens a diminution of congressional influence in the legislative process.[17] It

14. Appellants' Reply Br. at 2.

15. *Id.* at 2–3.

16. *Id.* (emphasis added).

17. Appellants dispute the contention that a broad construction of the pocket veto clause can affect the legislative balance of power.

seems to this court axiomatic that, to the extent that Congress' role in the government is thus diminished, so too must be the individual roles of each of its members. Put another way, the influence of any one legislator upon the political process is in great measure dependent upon the stature of the governmental branch of which he is a member.

In a sense, therefore, the contention that appellee's interest in the pocket veto controversy is "derivative" is correct. It is derivative, but it is nonetheless substantial. When asserted in the context of a particular dispute about specific legislation, such an interest may be sufficient to confer standing. Appellee's stake in this litigation is a quantum of his official influence upon the legislative process. To be sure, that influence can never be "the legal or political equivalent of the passage" of a bill, for only Congress as a body has that authority. Nevertheless, the office of United States Senator does confer a participation in the power of the Congress which is exercised by a Senator when he votes for or against proposed legislation. In the present case, appellee has alleged that conduct by officials of the executive branch amounted to an illegal nullification not only of Congress' exercise of its power, but also of appellee's exercise of his power. In the language of the *Coleman* opinion, appellee's object in this lawsuit is to vindicate the effectiveness of his vote. No more essential interest could be asserted by a legislator. We are satisfied, therefore, that the purposes of the standing doctrine are fully served in this litigation.

## II.

Article I, section 7, paragraph 2 of the United States Constitution prescribes the manner in which laws of the United States are enacted:

> Every Bill which shall have passed the House of Representatives and the Senate, shall, before it become a Law, be presented to the President of the United States; If he approves he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it. If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered, and if approved by two thirds of that House, it shall become a Law. But in all such Cases the Votes of both Houses shall be determined by yeas and Nays, and the Names of the Persons voting for and against the Bill shall be entered on the Journal of each House respectively. If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been

---

Two defenses are suggested whereby Congress can maintain legislative supremacy: (1) if disapproval is anticipated, Congress may delay the presentation of a bill until after the recess in order to preserve its right to override; (2) Congress may reenact a pocket-vetoed bill and present it to the President a second time. Appellants' Br. at 44–45. While both of these procedures might be effective, they would not change the fact that the pocket veto power will have been used as an obstacle—however temporary—to the implementation of the will of Congress. Moreover, such delays may for practical purposes become permanent. As appellee points out in his brief at 54:

> It is no answer to say that if Congress wishes, it can simply pass a pocket-vetoed bill again and present it to the President at a time when the pocket veto cannot be used. At best, the legislative route is arduous and time-consuming, involving numerous sub-committee, full committee, and other proceedings in both the Senate and the House. At worst, if delay has dimmed the constellation of public and private interests that facilitated the original passage of the bill, if the unique alchemy that enabled the legislative process to function successfully the previous time around has disappeared, the result may be that the bill cannot be passed at all.

It is significant, too, that the utilization of a broadly construed pocket veto power is likely to grow with the increasing frequency of brief, intrasession adjournments. *See infra* note 40 and accompanying text.

presented to him, the Same shall be a Law, in like Manner as if he had signed it, *unless the Congress by their Adjournment prevent its Return, in which Case it shall not be a Law.* (Emphasis added.)

At issue in this case is whether the Christmas adjournment of 1970 was one which "prevented" the return of S. 3418 by the President. If so, then the President's failure to approve the bill within ten days of its presentation to him constituted a pocket veto. If the adjournment did not prevent the return of S. 3418, then the bill became law without the President's signature. Our study of the constitutional text itself, its history and previous judicial interpretations of it convinces us that an intrasession adjournment of Congress does not prevent the President from returning a bill which he disapproves so long as appropriate arrangements are made for the receipt of presidential messages during the adjournment. Since the adjournment in question falls into this category, we affirm the district court's declaration that S. 3418 became law on December 25, 1970.

▅▅ Our analysis begins with the premise that the pocket veto power is an exception to the general rule that Congress may override presidential disapproval of proposed legislation. Rejection of an absolute presidential veto is explicit both in the proceedings of the Constitutional Convention[18] and in contemporaneous commentary. Alexander Hamilton, himself an advocate of the absolute veto during the Convention,[19] later took pains to distinguish the presidential veto power from that of the King of England:

> The President of the United States is to have power to return a bill, which shall have passed the two branches of the Legislature, for re-consideration;

but the bill so returned is to become a law, if upon that re-consideration it be approved by two thirds of both houses. The King of Great Britain, on his part, has an absolute negative upon the acts of the two houses of Parliament. The disuse of that power for a considerable time past, does not affect the reality of its existence; and is to be ascribed wholly to the crown's having found the means of substituting influence to authority, or the art of gaining a majority in one or the other of the two houses, to the necessity of exerting a prerogative which could seldom be exerted without hazarding some degree of national agitation. The qualified negative of the President differs widely from this absolute negative of the British sovereign . . . .

The Federalist No. 69, at 463–64 (J. Cooke ed. 1961) (A. Hamilton). Since it operates as an "absolute negative", the pocket veto power is a departure from the central scheme of the Constitution. As such, it must be limited by the specific purpose it is intended to serve, a purpose explained in the following passage from Story's *Commentaries:*

> But the President might effectually defeat the wholesome restraint [*i. e.* congressional override], thus intended, upon his qualified negative, if he might silently decline to act after a bill was presented to him for approval or rejection. The Constitution, therefore, has wisely provided, that, "if any bill shall not be returned by the President within ten days (Sundays excepted) after it shall have been presented to him, it shall be a law, in like manner as if he had signed it." But if this clause stood alone, Congress might, in like manner, defeat the due exercise of his qualified negative by a termination of the session,

---

18. 1 M. Farrand, The Records of the Federal Convention of 1787, at 104, 106 (Rev. ed. 1937) [hereinafter cited as M. Farrand]; 2 M. Farrand at 71, 200, 301, 582, 585 (the last page recording the opinion of one delegate that even a provision requiring a three-fourths

vote to override "puts too much in the power of the President").

19. 1 M. Farrand at 192, 300. *See also* 3 M. Farrand at 624, 627.

which would render it impossible for the President to return the bill. It is therefore added, "unless the Congress, by their adjournment, prevent its return, in which case it shall not be a law."[20]

The pocket veto power is one component of a constitutional mechanism designed to enforce respect on the part of each of the law-making branches of the government for the legislative authority of the other. This understanding of the purpose of the clause has led the Supreme Court to adopt a rule of construction which governs in this case:

> The constitutional provisions [i. e., article I, section 7, paragraph 2] have two fundamental purposes; (1) that the President shall have suitable opportunity to consider the bills presented to him, and (2) that the Congress shall have suitable opportunity to consider his objections to bills and on such consideration to pass them over his veto provided there are the requisite votes. Edwards v. United States, 286 U.S. 482, 486 [52 S.Ct. 627, 628, 76 L.Ed. 1239]. We should not adopt a construction which would frustrate either of these purposes.

Wright v. United States, 302 U.S. 583, 596, 58 S.Ct. 395, 400, 82 L.Ed. 439 (1938). Where possible, then, the pocket veto clause should be construed in a manner which preserves both purposes. Since a pocket veto always has the effect of frustrating Congress' right to reconsider a vetoed bill,[21] the preferred construction of the clause is that return of

a bill was not "prevented" by an adjournment. Only two decisions of the Supreme Court have addressed the question of whether an adjournment prevented the return of a bill. Appellant relies upon the first of these and seeks to distinguish the later decision from the present case.

The decision relied upon by appellant is The Pocket Veto Case, 279 U.S. 655, 49 S.Ct. 463, 73 L.Ed. 894 (1929), which held that the intersession adjournment of the 69th Congress prevented the return of a bill which had been presented to the President eight days (excluding Sunday) before the adjournment of the first session. The opinion states two reasons for the holding: (1) the word "House" in the return veto clause means "House in session" and does not permit return of a bill to an officer or agent of the originating House during an adjournment; (2) return of a bill during an intersession adjournment would result in a long delay in the final disposition of the bill attended by public uncertainty as to its status. Id. at 682–684, 49 S.Ct. 463.[22] A significant exception to this holding was established in the Supreme Court's only other pocket veto decision, Wright v. United States, supra, 302 U.S. at 589–590, 58 S.Ct. 395.[23] Addressing the first part of the Pocket Veto Case rationale, the Court held that the return of a bill may, in certain instances, be accomplished by delivery to an appropriate agent of the originating House:

> Nor was there any practical difficulty in making the return of the bill

---

**20.** 1 J. Story, Commentaries on the Constitution of the United States § 891 (5th ed. 1905) (footnotes omitted).

**21.** Where a pocket veto is appropriate there is, by definition, no congressional right to override. See supra note 13.

**22.** The Court also cited "the practical construction that has been given to [the clause] by the Presidents through a long course of years, in which Congress has acquiesced." 279 U.S. at 688–689, 49 S.Ct. at 469. A similar argument was made in this case and is treated below.

**23.** In that case, a bill was return-vetoed by the President during a brief recess of the Senate, the originating House. The petitioner, who relied upon the bill as the jurisdictional basis for his unsuccessful claim in the Court of Claims, argued that no valid return had been effected. It was apparently his simultaneous contention that no pocket veto was possible because "Congress" as a whole had not adjourned within the meaning of the phrase "unless the Congress by their Adjournment prevent its return." See 302 U.S. at 597, 58 S.Ct. 395. See also Comment, The Veto of S. 3418: More Congressional Power in the President's Pocket?, 22 Catholic L. Rev., 385, 391 (1973).

during the recess. The organization of the Senate continued and was intact. The Secretary of the Senate was functioning and was able to receive, and did receive, the bill. Under the constitutional provision [article I, section 5, paragraph 4] the Senate was required to reconvene in not more than three days and thus would be able to act with reasonable promptitude upon the President's objections. There is no greater difficulty in returning a bill to one of the two Houses when it is in recess during the session of Congress than in presenting a bill to the President by sending it to the White House in his temporary absence. Such a presentation is familiar practice. The bill is sent by a messenger and is received by the President. It is returned by a messenger, and why may it not be received by the accredited agent as the legislative body? To say that the President cannot return a bill when the House in which it originated is in recess during the session of Congress, and thus afford an opportunity for the passing of the bill over the President's objections, is to ignore the plainest practical considerations and by implying a requirement of an artificial formality to erect a barrier to the exercise of a constitutional right.

*Id.* at 589–590, 58 S.Ct. at 398. The Court then discussed the dangers it had foreseen at the time of its earlier decision:

However real these dangers may be when Congress has adjourned and the members of its Houses have dispersed at the end of a session—the situation with which the Court was dealing—they appear to be illusory when there is a mere temporary recess. Each House for its convenience, and during its session and the session of Congress, may take, and frequently does take, a brief recess limited, as we have seen, in the absence of the consent of the other House, to a period of three days. In such case there is no withholding of the bill from appropriate legisla-

tive record for weeks or perhaps months, no keeping of the bill in a state of suspended animation with no certain knowledge on the part of the public whether it was seasonably delivered, no causing of any undue delay in its reconsideration. When there is nothing but such a temporary recess the organization of the House and its appropriate officers continue to function without interruption, the bill is properly safeguarded for a very limited time, and is promptly reported and may be reconsidered immediately after the short recess is over. The prospect that in such a case the public may not be promptly and properly informed of the return of the bill with the President's objections, or that the bill will not be properly safeguarded or duly recorded upon the journal of the House, or that it will not be subject to reasonably prompt action by the House, is, we think, wholly chimerical. If we regard the manifest realities of the situation, we cannot fail to see that a brief recess by one House, such as is permitted by the Constitution without the consent of the other House, during the session of Congress, does not constitute such an interruption of the session of the House as to give rise to the dangers which, as the Court apprehended, might develop after the Congress has adjourned.

*Id.* at 595–596, 58 S.Ct. at 400. Appellants emphasize two factual distinctions between *Wright* and the present case: (1) *Wright* involved an adjournment of only three days, a shorter period that the five-day adjournment at issue in this case; (2) only the Senate had adjourned in the former case whereas both Houses were in recess at the time S. 3418 was disapproved. These distinctions fail to overcome the logic and reasoning of the *Wright* decision.

The five-day recess in this case was only two days longer than that considered in *Wright.* Moreover, the most significant portion of the recess, that which extended beyond the ten-day period for return of a bill, was only one day

longer than that which occurred in *Wright*,[24] and was actually within the maximum delay explicitly approved in *Wright*.[25] As in the former case, the Senate continued in existence during the Christmas recess of 1970 and the Secretary of the Senate was available to receive messages from the President during the adjournment.[26] There was no danger that the bill could not be reconsidered "with reasonable promptitude" should it be returned by the President during the adjournment.[27] For these reasons, the mere fact that the Senate was not in session to physically receive the President's objections does not require the conclusion that the Congress had, by its adjournment, prevented the return of S. 3418.

The fact that the House of Representatives had not adjourned in the *Wright* case is also a distinction without a difference.[28] Assuming that the conclu-

sion of the foregoing paragraph is correct, it is difficult to see how the presence or absence of the non-originating House at the time of the return could affect our decision. To hold that a return veto is possible while the originating House alone is in brief recess but not when both Houses are in recess would embrace ritual at the expense of logic.[29]

As the foregoing discussion demonstrates, the present case falls within the exception—or, at least, within a logical extension of the exception—to the *Pocket Veto Case* established in *Wright*. Even if *Wright* were not applicable, however, appellants' reliance upon the *Pocket Veto Case* would be misplaced. The modern practice of Congress with respect to intrasession adjournments creates neither of the hazards—long delay and public uncertainty—perceived in the *Pocket Veto Case*.

24. The Senate's 1970 Christmas recess extended from Tuesday, December 22 to Monday, December 28—a period of five days (excluding Sunday). *See supra* note 5. The *Wright* case involved an adjournment by the Senate of less than three days from Monday, May 4, 1936 until Thursday, May 7, 1936. 302 U.S. at 585, 58 S.Ct. 395. The last day for return of S. 3418 was December 25, 1970, two days (excluding Sunday) before the end of the Senate recess. In *Wright*, the tenth day fell on May 6, 1936, the day before the Senate's return. 302 U.S. at 592, 58 S.Ct. 395.

25. Even a narrow construction of *Wright* permits return of a bill during a recess of the originating House which began at the end of the ninth day of the President's tenday period for consideration. In such a case, Congress' reconsideration of the bill would be delayed at least two days. *See* Kennedy v. Sampson, *supra*, 364 F.Supp. at 1086.

26. Unlike the *Wright* case, the Secretary of the Senate was expressly authorized to receive messages from the President during the 1970 Christmas adjournment. *See supra* note 6.

27. The *Wright* opinion emphasizes that a brief recess does not occasion long delay of Congress' reconsideration of a bill returned during the recess—a problem envisioned in the case of the months-long intersession adjournment considered in the *Pocket Veto Case*. As demonstated above, the Christmas recess of 1970

comes within the reasoning of *Wright* on this point. We do not thereby intimate, however, that prompt reconsideration of a returned bill is constitutionally required in order to override a return veto. The Constitution itself sets no time limit upon Congress' right to override a presidential veto. By the same token, as we indicate in our alternative discussion, *infra*, the mere duration of an intrasession adjournment will not "prevent" the return of a bill absent some constitutional evil such as the danger of public uncertainty perceived in the *Pocket Veto Case*.

28. The House of Representatives was in recess from December 22, 1970 until December 29, 1970, the day after the Senate's return. *See supra* note 5.

29. *See* Note, The Presidential Veto Power: A Shallow Pocket, 70 Mich.L.Rev. 148, 161–62 (1971). The *Wright* opinion does state at the outset that the return of the disapproved bill was not prevented because "Congress" (*i. e.* both Houses) had not adjourned. This clearly was not the basis for its decision, however, since the Court expressly reserved the question of whether a more extended one-House adjournment might "prevent" the return of a vetoed bill. 302 U.S. at 598, 58 S.Ct. 395. The Court relied, rather, upon the reasoning which we have outlined above; the brevity of the recess and the availability of efficient methods for delivery of the President's veto message.

First of all, intrasession adjournments are much shorter than the intersession adjournment considered in the *Pocket Veto Case*. At the time of that decision, intersession adjournments of five or six months were still common.[30] By contrast, only four intrasession adjournments in the history of the Congress have exceeded sixty days in duration. Of these, only two occurred in this century—a sixty-seven day recess in 1943 and a sixty-four day recess in 1950.[31] Aside from these four, there have been one hundred twenty-nine intrasession adjournments of more than three days as of June, 1974: two of them for periods of fifty to sixty days; seven for periods of thirty to forty days; and two for periods of twenty to thirty days. The remaining one hundred eighteen were for periods of less than twenty days.[32] Until 1932, practically every one of these adjournments was a Christmas holiday recess.[33] In 1933 the twentieth amendment took effect, setting January 3rd as the customary date for commencement of each session of Congress. As a consequence, the pattern of intrasession recesses was altered somewhat over the ensuing years. In the last decade, however, a consistent pattern of intrasession adjournments has again developed. Typically, there are several recesses of approximately five days for various holidays and a summer recess (or recesses) lasting about one month.[34]

Plainly, intrasession adjournments of Congress have virtually never occasioned interruptions of the magnitude considered in the *Pocket Veto Case*.[35] More importantly, return of a bill during an intrasession adjournment, whatever its length, can no longer cause the public uncertainty envisioned in the *Pocket Veto Case*. Modern methods of communication make it possible for the return of a disapproved bill to an appropriate officer of the originating House to be accomplished as a matter of public record accessible to every citizen. The status of such a bill would be clear; it has failed to receive presidential approval but may yet become law if Congress, upon resumption of its deliberations, passes the bill again by a two-thirds majority. This state of affairs generates no more public uncertainty than does the return of a disapproved bill while Congress is in actual session.[36] The only possible uncertainty about this situation arises from the absence of a definitive ruling as to whether an intrasession adjournment "prevents" the return of a vetoed bill.[37] Hopefully, our present opinion eliminates that ambiguity.

Appellants' briefs directs our attention to the "consistent executive practice" regarding pocket vetoes during intrasession adjournments. The court has considered this argument and finds it unpersuasive. As appellants admit, consistent practice cannot create or destroy an executive power. Appellants' Br. at 37–38.

In addition, the precedents cited by appellants are not strong. Of only thirty-eight intrasession pocket vetoes in the nation's history, thirty (or 78%) have occurred since the inauguration of President Franklin Roosevelt.[38] None occurred prior to 1867.[39] The intrasession pocket veto is, therefore, a relatively

---

30. The intersession adjournments of the 68th, 69th and 70th Congresses lasted six months, five months, and six months respectively. 1974 Congressional Directory 396. These Congresses covered the period from December, 1923 to March, 1929. The *Pocket Veto Case* was decided in 1929.

31. The other two adjournments occurred in 1867 (94 days and 123 days). *See* Appendix herein.

32. *See* Appendix.

33. *Id.* The exceptions are numbered 9, 12 13, 61 and 70 in Appendix.

34. *See* items 88–133 in Appendix.

35. The only intrasession adjournments approaching this occurred in 1867. *See supra* note 31.

36. The length of an intrasession adjournment *per se* does not prevent the return of a disapproved bill for reconsideration. The Constitution sets no time limit on the right of Congress to override a presidential veto.

37. *Hearings, supra* note 13 at 14, 15.

38. *See* Appendix.

39. *Id.*

modern phenomenon. Moreover, it is a phenomenon which has gained new significance in recent years as brief, intrasession recesses have become more frequent.[40] The present case arises from the shortest intrasession recess ever relied upon by any President as having prevented the return of a disapproved bill.[41] It is also significant that, in the single case which presented the issue of whether an intrasession adjournment precluded a return veto, the Supreme Court ruled that it had not. *Wright v. United States, supra.* In our view, therefore, the question raised in this case is still very much an open one, prior executive practice notwithstanding.

 In summary, we hold that the Christmas recess of 1970 did not prevent the return of S. 3418—a conclusion which may be reached by either of two routes. First, the present case is governed by the logic, if not the precise holding, of the *Wright* decision. Second, the case is an appropriate one for disposition of the question of whether any intrasession adjournment, as that practice is presently understood, can prevent the return of a bill by the President where appropriate arrangements have been made for receipt of presidential messages during the adjournment—a question which must be answered in the negative.

Affirmed.

## APPENDIX

### INTRASESSION ADJOURNMENTS OF MORE THAN THREE DAYS BY CONGRESS (1789–June, 1974), INDICATING THE NUMBER OF POCKET VETOES DURING EACH ADJOURNMENT [1]

| Congress/ Session | | Dates of Adjournment [2] | Length of Adjournment (Days) | Number of Pocket Vetoes |
|---|---|---|---|---|
| 6/2 | 1. | Dec. 24, 1800–Dec. 30, 1800 | 6 | 0 |
| 15/1 | 2. | Dec. 25, 1817–Dec. 29, 1817 | 4 | 0 |
| 20/2 | 3. | Dec. 25, 1828–Dec. 29, 1828 | 4 | 0 |
| 35/1 | 4. | Dec. 24, 1857–Jan. 4, 1858 | 11 | 0 |
| 35/2 | 5. | Dec. 24, 1858–Jan. 4, 1859 | 11 | 0 |
| 37/3 | 6. | Dec. 24, 1862–Jan. 5, 1863 | 12 | 0 |
| 38/1 | 7. | Dec. 24, 1863–Jan. 5, 1864 | 12 | 0 |
| 38/2 | 8. | Dec. 23, 1864–Jan. 5, 1865 | 13 | 0 |
| 39/1 | 9. | Dec. 7, 1865–Dec. 11, 1865 | 4 | 0 |
| | 10. | Dec. 22, 1865–Jan. 5, 1866 | 14 | 0 |
| 39/2 | 11. | Dec. 21, 1866–Jan. 3, 1867 | 13 | 0 |
| 40/1 | 12. | March 31, 1867–July 1, 1867 | 92 | 1 |
| | 13. | July 21, 1867–Nov. 21, 1867 | 123 | 1 |
| 40/2 | 14. | Dec. 21, 1867–Jan. 6, 1868 [3] | 16 | 2 |

40. *Id.*

41. *Id.*

1. Source: 1974 Congressional Directory 392; Presidential Vetoes, Record of Bills Vetoed and Action Taken Thereon by the Senate and House of Representatives, 1789–1968 (Compiled by Senate Library, 1969); Calendar, 93rd Cong. (June 24, 1974).

2. The date of the beginning of each adjournment is the first day on which neither House was in session; the date of the end of each adjournment is the day on which one or both Houses resumed the session.

3. There were additional adjournments in this session, from July 27, 1868, to September 21, to October 16, and to November 10. No business was transacted subsequent to July

APPENDIX—Continued

| Congress/ Session | | Dates of Adjournment | Length of Adjournment (Days) | Number of Pocket Vetoes |
|---|---|---|---|---|
| 40/3 | 15. | Dec. 22, 1868–Jan. 5, 1869 | 14 | 0 |
| 41/2 | 16. | Dec. 23, 1869–Jan. 10, 1870 | 18 | 0 |
| 41/3 | 17. | Dec. 23, 1870–Jan. 4, 1871 | 12 | 0 |
| 42/2 | 18. | Dec. 22, 1871–Jan. 8, 1872 | 17 | 0 |
| 42/3 | 19. | Dec. 21, 1872–Jan. 6, 1873 | 16 | 0 |
| 43/1 | 20. | Dec. 20, 1873–Jan. 5, 1874 | 16 | 0 |
| 43/2 | 21. | Dec. 24, 1874–Jan. 5, 1875 | 12 | 0 |
| 44/1 | 22. | Dec. 21, 1875–Jan. 5, 1876 | 15 | 0 |
| 45/2 | 23. | Dec. 16, 1877–Jan. 10, 1878 | 25 | 0 |
| 45/3 | 24. | Dec. 21, 1878–Jan. 7, 1879 | 17 | 0 |
| 46/2 | 25. | Dec. 20, 1879–Jan. 6, 1880 | 17 | 0 |
| 46/3 | 26. | Dec. 23, 1880–Jan. 5, 1881 | 13 | 0 |
| 47/1 | 27. | Dec. 22, 1881–Jan. 5, 1882 | 14 | 0 |
| 48/1 | 28. | Dec. 25, 1883–Jan. 7, 1884 | 13 | 0 |
| 48/2 | 29. | Dec. 25, 1884–Jan. 5, 1885 | 11 | 0 |
| 49/1 | 30. | Dec. 22, 1885–Jan. 5, 1886 | 14 | 0 |
| 49/2 | 31. | Dec. 23, 1886–Jan. 4, 1887 | 12 | 0 |
| 50/1 | 32. | Dec. 23, 1887–Jan. 4, 1888 | 12 | 0 |
| 50/2 | 33. | Dec. 22, 1888–Jan. 2, 1889 | 11 | 0 |
| 51/1 | 34. | Dec. 22, 1889–Jan. 6, 1890 | 15 | 0 |
| 52/1 | 35. | Dec. 24, 1891–Jan. 5, 1892 | 12 | 0 |
| 52/2 | 36. | Dec. 23, 1892–Jan. 4, 1893 | 12 | 1 |
| 53/2 | 37. | Dec. 22, 1893–Jan. 3, 1894 | 12 | 0 |
| 53/3 | 38. | Dec. 23, 1894–Jan. 3, 1895 | 11 | 0 |
| 54/2 | 39. | Dec. 23, 1896–Jan. 5, 1897 | 13 | 2 |
| 55/2 | 40. | Dec. 19, 1897–Jan. 5, 1898 | 17 | 0 |
| 55/3 | 41. | Dec. 22, 1898–Jan. 4, 1899 | 13 | 0 |
| 56/1 | 42. | Dec. 21, 1899–Jan. 3, 1900 | 13 | 0 |
| 56/2 | 43. | Dec. 22, 1900–Jan. 3, 1901 | 12 | 0 |
| 57/1 | 44. | Dec. 20, 1901–Jan. 6, 1902 | 17 | 0 |
| 57/2 | 45. | Dec. 21, 1902–Jan. 5, 1903 | 15 | 0 |
| 58/2 | 46. | Dec. 20, 1903–Jan. 4, 1904 | 15 | 0 |
| 58/3 | 47. | Dec. 22, 1904–Jan. 5, 1905 | 14 | 0 |
| 59/1 | 48. | Dec. 22, 1905–Jan. 4, 1906 | 13 | 0 |
| 59/2 | 49. | Dec. 21, 1906–Jan. 3, 1907 | 13 | 0 |
| 60/1 | 50. | Dec. 22, 1907–Jan. 6, 1908 | 15 | 0 |
| 60/2 | 51. | Dec. 20, 1908–Jan. 4, 1909 | 15 | 0 |
| 61/2 | 52. | Dec. 22, 1909–Jan. 4, 1910 | 13 | 0 |
| 61/3 | 53. | Dec. 22, 1910–Jan. 5, 1911 | 14 | 0 |
| 62/2 | 54. | Dec. 22, 1911–Jan. 3, 1912 | 12 | 0 |
| 62/3 | 55. | Dec. 20, 1912–Jan. 2, 1913 | 13 | 0 |
| 63/2 | 56. | Dec. 24, 1913–Jan. 12, 1914 | 19 | 0 |
| 63/3 | 57. | Dec. 24, 1914–Dec. 29, 1914 | 5 | 0 |
| 64/1 | 58. | Dec. 18, 1915–Jan. 4, 1916 | 17 | 0 |

27, 1868, and the session adjourned *sine die* on November 10. In effect, the adjournment on July 27 was a *sine die* adjournment.

President Andrew Johnson pocket vetoed two bills presented to him after the adjournment of July 27, 1868.

APPENDIX—Continued

| Congress/ Session | | Dates of Adjournment | Length of Adjourn- ment (Days) | Number of Pocket Vetoes |
|---|---|---|---|---|
| 64/2 | 59. | Dec. 23, 1916–Jan. 2, 1917 | 10 | 0 |
| 65/2 | 60. | Dec. 19, 1917–Jan. 3, 1918 | 15 | 0 |
| 66/1 | 61. | July 2, 1919–July 8, 1919 | 6 | 0 |
| 66/2 | 62. | Dec. 21, 1919–Jan. 5, 1920 | 15 | 0 |
| 67/2 | 63. | Dec. 23, 1921–Jan. 3, 1922 | 11 | 0 |
| 68/1 | 64. | Dec. 21, 1923–Jan. 3, 1924 | 13 | 0 |
| 68/2 | 65. | Dec. 21, 1924–Dec. 29, 1924 | 8 | 0 |
| 69/1 | 66. | Dec. 23, 1925–Jan. 4, 1926 | 12 | 0 |
| 69/2 | 67. | Dec. 23, 1926–Jan. 3, 1927 | 11 | 0 |
| 70/1 | 68. | Dec. 22, 1927–Jan. 4, 1928 | 13 | 0 |
| 70/2 | 69. | Dec. 23, 1928–Jan. 3, 1929 | 11 | 1 |
| 71/1 | 70. | June 20, 1929–Aug. 19, 1929 | 60 | 0 |
| 71/2 | 71. | Dec. 22, 1929–Jan. 6, 1930 | 15 | 0 |
| 71/3 | 72. | Dec. 21, 1930–Jan. 5, 1931 | 15 | 0 |
| 72/1 | 73. | Dec. 23, 1931–Jan. 4, 1932 | 12 | 0 |
| 74/2 | 74. | June 9, 1936–June 15, 1936 | 6 | 0 |
| 76/3 | 75. | July 12, 1940–July 22, 1940 | 10 | 0 |
| 78/1 | 76. | July 9, 1943–Sept. 14, 1943 | 67 | 3 |
| 78/2 | 77. | Apr. 2, 1944–Apr. 12, 1944 | 10 | 1 |
| | 78. | June 24, 1944–Aug. 1, 1944 | 38 | 5 |
| | 79. | Sept. 22, 1944–Nov. 14, 1944 | 53 | 1 |
| 79/1 | 80. | Aug. 2, 1945–Sept. 5, 1945 | 34 | 0 |
| 80/1 [4] | | | | |
| 80/2 [5] | | | | |
| 81/2 | 81. | Sept. 24, 1950–Nov. 27, 1950 | 64 | 6 |
| 83/2 [6] | | | | |
| 84/1 | 82. | Apr. 5, 1955–Apr. 13, 1955 | 8 | 0 |
| 84/2 | 83. | Mar. 30, 1956–Apr. 9, 1956 | 10 | 1 |
| 85/1 | 84. | Apr. 19, 1957–Apr. 29, 1957 | 10 | 0 |
| 85/2 | 85. | Apr. 4, 1958–Apr. 14, 1958 | 10 | 0 |
| 86/1 | 86. | Mar. 27, 1959–Apr. 7, 1959 | 11 | 0 |

4. The Senate and the House of Representatives adjourned on July 27, 1947 under a "conditional final adjournment" resolution, S.Con. Res. 33; 93 Cong.Rec. 10400. Pursuant to the resolution, the two Houses were to stand in adjournment until January 2, 1948, unless recalled into session earlier by specified Senate and House leaders. In effect, the adjournment was a *sine die* adjournment, not an intrasession adjournment. On November 17, 1947, Congress convened pursuant to proclamation of President Truman, and adjourned *sine die* on December 19, 1947. The President pocket vetoed 19 bills presented to him after the adjournment of July 27, 1947.

5. The Senate and the House of Representatives adjourned on June 20, 1948, under a "conditional final adjournment" resolution, H.Con.Res. 218; 94 Cong.Rec. 9158. Pursuant to the resolution, the two Houses were to stand in adjournment until December 31, 1948, unless recalled into session earlier by specified Senate and House leaders. In effect, the adjournment was a *sine die* adjournment, not an intrasession adjournment. On July 26, 1948, Congress convened pursuant to a proclamation of President Truman. The President pocket vetoed 14 bills presented to him after the adjournment of June 20, 1948.

6. The House adjourned *sine die* on August 20, 1954. Thereafter President Eisenhower pocket vetoed twenty-five bills. Although the Senate remained in session until December 2, 1954, these were not intrasession pocket vetoes since the House had already finally adjourned.

APPENDIX—Continued

| Congress/ Session | | Dates of Adjournment | Length of Adjourn- ment (Days) | Number of Pocket Vetoes |
|---|---|---|---|---|
| 86/2 | 87. | July 4, 1960–Aug. 8, 1960 | 35 | 6 |
| 88/2 | 88. | July 11, 1964–July 20, 1964 | 9 | 0 |
| | 89. | Aug. 22, 1964–Aug. 31, 1964 | 9 | 1 |
| 89/2 | 90. | Apr. 8, 1966–Apr. 13, 1966 | 5 | 0 |
| | 91. | July 1, 1966–July 11, 1966 | 10 | 0 |
| 90/1 | 92. | Mar. 24, 1967–Apr. 3, 1967 | 10 | 0 |
| | 93. | June 30, 1967–July 10, 1967 | 10 | 0 |
| | 94. | Sept. 1, 1967–Sept. 11, 1967 | 10 | 0 |
| | 95. | Nov. 23, 1967–Nov. 27, 1967 | 4 | 0 |
| 90/2 | 96. | Apr. 12, 1968–Apr. 17, 1968 | 5 | 0 |
| | 97. | May 30, 1968–June 3, 1968 | 4 | 0 |
| | 98. | July 4, 1968–July 8, 1968 | 4 | 0 |
| | 99. | Aug. 3, 1968–Sept. 4, 1968 | 32 | 1 |
| 91/1 | 100. | Feb. 8, 1969–Feb. 17, 1969 | 9 | 0 |
| | 101. | Apr. 4, 1969–Apr. 14, 1969 | 10 | 0 |
| | 102. | July 3, 1969–July 7, 1969 | 4 | 0 |
| | 103. | Aug. 14, 1969–Sept. 3, 1969 | 20 | 0 |
| | 104. | Nov. 27, 1969–Dec. 1, 1969 | 4 | 0 |
| 91/2 | 105. | Feb. 11, 1970–Feb. 16, 1970 | 5 | 0 |
| | 106. | Mar. 27, 1970–Mar. 31, 1970 | 4 | 0 |
| | 107. | Sept. 3, 1970–Sept. 8, 1970 | 5 | 0 |
| | 108. | Oct. 15, 1970–Nov. 16, 1970 | 32 | 1 |
| | 109. | Nov. 26, 1970–Nov. 30, 1970 | 4 | 0 |
| | 110. | Dec. 23, 1970–Dec. 28, 1970 | 5 | 2 |
| 92/1 | 111. | Feb. 21, 1971–Feb. 26, 1971 | 5 | 0 |
| | 112. | Apr. 8, 1971–Apr. 14, 1971 | 6 | 0 |
| | 113. | May 28, 1971–June 1, 1971 | 4 | 0 |
| | 114. | July 2, 1971–July 6, 1971 | 4 | 0 |
| | 115. | Aug. 7, 1971–Sept. 8, 1971 | 32 | 1 |
| | 116. | Oct. 22, 1971–Oct. 26, 1971 | 4 | 0 |
| | 117. | Nov. 25, 1971–Nov. 29, 1971 | 4 | 0 |
| 92/2 | 118. | Feb. 10, 1972–Feb. 14, 1972 | 4 | 0 |
| | 119. | Mar. 31, 1972–Apr. 4, 1972 | 4 | 0 |
| | 120. | May 26, 1972–May 30, 1972 | 4 | 0 |
| | 121. | July 1, 1972–July 17, 1972 | 16 | 0 |
| | 122. | Aug. 19, 1972–Sept. 5, 1972 | 17 | 1 |
| 93/1 | 123. | Feb. 9, 1973–Feb. 15, 1973 | 6 | 0 |
| | 124. | Apr. 20, 1973–Apr. 30, 1973 | 10 | 0 |
| | 125. | May 25, 1973–May 29, 1973 | 4 | 0 |
| | 126. | July 1, 1973–July 9, 1973 | 8 | 0 |
| | 127. | Aug. 4, 1973–Sept. 5, 1973 | 32 | 0 |
| | 128. | Oct. 19, 1973–Oct. 23, 1973 | 4 | 0 |
| | 129. | Nov. 22, 1973–Nov. 26, 1973 | 4 | 0 |
| 93/2 | 130. | Feb. 9, 1974–Feb. 13, 1974 | 4 | 0 |
| | 131. | Mar. 14, 1974–Mar. 19, 1974 | 5 | 0 |
| | 132. | Apr. 12, 1974–Apr. 22, 1974 | 10 | 0 |
| | 133. | May 24, 1974–May 28, 1974 | 4 | 0 |

FAHY, Senior Circuit Judge, with whom BAZELON, Chief Judge, joins.

I concur in the opinion of Judge Tamm for the court, adding only a few notes.

Appellants contend in this court only that Senator Kennedy lacks standing to obtain the adjudication he seeks, and that the proposed legislation never became law because of a valid pocket veto. The opinion of Judge Tamm meets these contentions. The position asserted in the District Court that the President was an indispensable party has not been renewed in this court; nor is any issue of jurisdiction or justiciability now raised, aside from the problem of standing as it might bear upon jurisdiction or justiciability.

I do not think the standing of Senator Kennedy is quite the same as the 20 Senators of the State of Kansas, the plaintiffs in Coleman v. Miller, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939). Ratification by Kansas of the Child Labor Amendment depended upon the validity of the vote of the Lieutenant Governor which the Senators challenged. If his vote should not have been counted the Senate was equally divided, 20–20, and ratification by Kansas would have failed. In the present case, Senator Kennedy's vote did not control passage of S. 3418. Nevertheless, his interest is substantial. As a United States Senator he represents a sovereign State whose people have a deep interest in the Act and look to their Senators to protect that interest; and he, as Senator, it seems to me, has a legal right not only to seek judicial protection of those interests, believed by him to be threatened by an invalid veto, but also, in the circumstances, to protect his own interest as a national legislator in the bill for which he voted. These interests I think do not depend for their protection upon affirmative approval by the Senate itself of efforts to obtain judicial relief. Moreover, as Judge Tamm points out, the Senator's stake in the outcome of the controversy meets the adversary test of standing under Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), and subsequent decisions of the Court.

The aliveness of the controversy also seems clear. Whether the Act is to continue in its present form of course is for Congress to decide, but it has not been abandoned. Although its uncertain status necessarily affected congressional appropriations, the Second Supplemental Appropriations Act, 1973, 87 Stat. 106, includes a $100,000 appropriation to carry out the purposes of the Family Practice of Medicine Act, S. 3418, to remain available until expended. S.Rep. No. 160, 93d Cong., 1st Sess. 48–49 (1973).