**Lee METCALF, of U.S. Senate, et al., Appellants,**

v.

**NATIONAL PETROLEUM COUNCIL et al.**

No. 76–1223.

United States Court of Appeals, District of Columbia Circuit.

Argued 15 Sept. 1976.

Decided 18 Feb. 1977.

Rehearing Denied April 4, 1977.

Richard B. Wolf, Washington, D.C., with whom Victor H. Kramer and Charles E. Hill, Washington, D.C., were on the brief, for appellants.

John K. Villa, Atty., Dept. of Justice, Washington, D.C., with whom Rex E. Lee, Asst. Atty. Gen., Earl J. Silbert, U. S. Atty., and Leonard Schaitman, Atty., Dept. of Justice, Washington, D.C., were on the brief for federal appellees. William Kanter and Thomas S. Martin, Attys., Dept. of Justice, Washington, D.C., also entered appearances for federal appellees.

R. Kenly Webster, Brice M. Clagett, and Charles Lister, Washington, D.C., were on the brief for appellees National Petroleum Council and others.

Before TAMM, MacKINNON and WIL-KEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

The appellants in this case are Lee Metcalf, a member of the United States Senate, and Robert Clarke Brown, a private citizen. On 21 March 1975 appellants filed suit in the District Court against the National Pe-

troleum Council[1] (hereinafter the Council or NPC), the Department of Interior (DOI), the Federal Energy Administration (FEA), and the Office of Management and Budget (OMB),[2] seeking to enjoin the Council from operating as a federal advisory committee. In essence, appellants contend that the Federal Advisory Committee Act[3] (FACA) and the Federal Energy Administration Act[4] (FEAA) are violated because the membership of the Council is not fairly balanced and its advice is inappropriately influenced by special interests.[5]

Both appellants predicate their standing to sue on the basis of injuries they allege to have suffered as consumers and citizens.[6] In addition, appellant Metcalf asserts that he has standing in his capacity as a United States Senator.[7] By order filed 9 February 1976, accompanied by a memorandum opinion,[8] the District Court (Pratt, J.) dismissed the case on the grounds that appellants lacked standing to maintain the action.[9] We conclude that appellants have suffered no judicially cognizable injury in their ca-

pacity as consumers and citizens and, further, that appellant Metcalf has suffered no injury in his capacity as a Senator. Accordingly, we affirm the order of the District Court.[10]

## I. THE NATURE OF APPELLANTS' CHALLENGE

### A. The Structure of the National Petroleum Council

In response to a request from President Truman, the Secretary of the Interior established the National Petroleum Council on 18 June 1946 as a source for advice on all matters related to oil and gas.[11] In an attempt to regulate advisory committees such as the NPC in a comprehensive and uniform fashion, Congress enacted FACA to take effect on 5 January 1973.[12] Although the NPC had operated for a considerable period of time prior to the effective date of FACA, it is clear that the Council is an advisory committee within the meaning of FACA and thus subject to the Act's provisions.[13] The key provisions of

---

1. The Chairman of the Council, John E. Swearingin, and the Council's Executive Director, Kenneth BeLieu, are also named as defendants in this case. We will make no separate reference to these individual defendants, and those listed in note 2, *infra*, in the course of the opinion.

2. At the time this action was filed the Secretary of the Interior was Rogers C. B. Morton, Frank G. Zarb was Administrator of the FEA, and James T. Lynn was Director of OMB. These defendants were all sued in their official capacities.

3. 5 U.S.C. App. I (Supp.1975).

4. 15 U.S.C. §§ 761 *et seq.* (Supp.1975).

5. Complaint, Joint Appendix (J.A.) at A–3.

6. Complaint, ¶¶ 3, 4, J.A. at A–4, A–5.

7. Complaint, ¶ 3, J.A. at A–5.

8. *Metcalf v. National Petroleum Council*, 407 F.Supp. 257 (D.D.C.1976).

9. *Id.* at 261.

10. After judgment was entered in the District Court, the appellants sought summary reversal and the appellees sought summary affirmance in this court. These requests were denied by

order of this court on 12 May 1976 (Leventhal and Robinson, JJ.). The court ordered that this appeal be heard on the same day and before the same panel as *Harrington v. Bush*, 180 U.S.App.D.C. ——, 553 F.2d 190 (1977). The *Harrington* case is also being decided today; since this case deals extensively with the issue of standing for legislators in the federal courts and contains an extended discussion of the general principles relating to standing, we will make frequent reference in this opinion to *Harrington*.

11. In response to a request from this Court during oral argument, the appellee NPC filed a set of supplementary materials concerning the history of the Council on 20 September 1976 (hereinafter referred to as Supplementary Materials). President Truman's letter requesting the establishment of the NPC is Attachment A to these Supplementary Materials.

12. 5 U.S.C. App. I §§ 2(b)(4), 15 (Supp.1975).

13. The Secretary of the Interior concedes that the NPC is subject to FACA; *see* Supplementary Materials, Attachment B. In addition, all other appellees in the suit treat the Council as an advisory committee within the meaning of FACA. Despite this concession by the appellees, the appellants seek a declaration that the NPC is a FACA advisory committee as part of their requested relief. Complaint, J.A. at A–13.

FACA for purposes of this litigation relate to the creation, membership, funding, and review of advisory committees.

1. *The Creation of Advisory Committees.* FACA deals explicitly with two types of federal advisory committees [14] —those that advise the President,[15] and those that advise the executive agencies of the Federal Government.[16] The NPC belongs to the latter category in that it exists to advise the Secretary of the Interior.[17]

FACA specifies three ways by which an advisory committee can be established: 1) an act of Congress;[18] 2) a specific authorization by the President;[19] or 3) a formal determination by the head of a federal agency that the establishment of the advisory body will be "in the public interest."[20] The third method was used in establishing the Council, the Secretary having made the required determination that the Council was necessary for the proper functioning of the DOI.[21] Thus, the existence of the NPC is not mandated by statute but exists because of the initiative taken by the Secretary.

Before an advisory committee can begin to function, it must be formally chartered in accordance with section 9(c) of FACA.[22] The charter must contain, *inter alia*, infor-

mation concerning the committee's objectives and the scope of its operations and duties.[23] The charter for the NPC was filed with the Secretary of the Interior on 9 January 1973 and provides the following description of the Council's duties:

> The functions of the [NPC] . . . are to advise, inform and make recommendations to the Secretary of the Interior with respect to any matter relating to petroleum or the petroleum industry submitted to it by, or approved by the Secretary of the Interior.[24]

A most important point with respect to the chartering of advisory committees is that these committees are chartered *to one federal agency.* The NPC is chartered to the DOI and to no other agency; the Secretary is responsible for approving the Council's charter.[25] The Council is not chartered to the Congress or any committee thereof. Although the NPC is not chartered to the Congress, FACA does require that a copy of the charter be filed with the standing committees of the Senate and House of Representatives having legislative jurisdiction over the DOI.[26] This requirement serves to facilitate the continuing review of advisory committees which these standing committees must conduct under FACA.[27]

---

Appellants also seek a declaration that each subgroup of the Council is an advisory committee within the meaning of FACA. Complaint, J.A. at A–13. The subgroups perform much of the research work for the Council (see text at note 66, *infra*). FACA specifically provides that subgroups of advisory committees are subject to the provisions of the Act. 5 U.S.C. App. I § 3(2) (Supp.1975). We need not decide if the NPC subgroups are advisory committees within the meaning of FACA; for purposes of ruling on the standing issue, we will assume that appellants' contentions regarding the subgroups are correct. See note 43, *infra*.

**14.** FACA does not specifically mention Congressional advisory committees; presumably, the Congress can establish such committees for its own use. See 5 U.S.C. App. I § 3(2)(A) (Supp.1975).

**15.** 5 U.S.C. App. I § 3(2)(B) (Supp.1975).

**16.** *Id.* § 3(2)(C).

**17.** When referring to advisory committees in the remainder of this opinion, we will be referring to those committees which advise the ex-

ecutive agencies of the federal government under § 3(2)(C).

**18.** 5 U.S.C. App. I § 9(a)(1) (Supp.1975).

**19.** *Id.*

**20.** *Id.* § 9(a)(2).

**21.** NPC Advisory Committee Charter, J.A. at A–48; Supplementary Materials, Attachment B.

**22.** 5 U.S.C. App. I § 14(b)(3) (Supp.1975).

**23.** *Id.* § 9(c).

**24.** NPC Advisory Committee Charter, J.A. at A–48.

**25.** 5 U.S.C. App. I § 9(c) (Supp.1975).

**26.** *Id.*

**27.** See text at notes 49 to 53, *infra*.

Although a federal advisory committee is chartered to only one agency, such committee can serve as an advisory committee to other federal agencies. FACA provides that an advisory group will be considered as an advisory committee within the meaning of the Act if it is "established or utilized" [28] by an agency. The FEAA contains a similar provision with respect to the "utilization" of advisory bodies.[29] Appellants contend that the FEA is indeed utilizing the NPC.[30] Since the FEAA contains its own requirement of a balanced membership on advisory committees,[31] and also incorporates by reference the FACA membership requirements,[32] appellants allege that the FEAA has also been violated.[33] Thus, although the NPC is not chartered to the FEA, appellants have named this agency as a defendant because of its alleged use of advice rendered by the Council.

2. *The Membership and Funding of Advisory Committees.* There is no dispute among the parties that some 140 out of the 155 members of the NPC are affiliated with the petroleum industry or that the subgroups which handle much of the Council's research work are similarly dominated by personnel from the petroleum industry.[34] The disagreement between the parties, and the precise focus of this lawsuit, concerns the legality of this industry domination of the NPC in light of the membership provisions in FACA. FACA in pertinent part requires that

the membership of [an] advisory committee . . . be fairly balanced in terms of the points of view represented and the functions to be performed by the advisory committee [and] that the advice and recommendations of the advisory committee will not be inappropriately influenced by the appointing authority or by any special interest, but will instead be the result of the advisory committee's independent judgment.[35]

Appellees contend that the requirements of FACA have been met by the present composition of the Council because the Council is balanced "in terms of . . . the functions to be performed by the advisory committee." That is, appellees interpret FACA as requiring only that the Council contain a reasonable representation of viewpoints from *within the petroleum industry.*[36] Appellees believe that the Council does contain such a balance since "all the operational elements" [37] and "every function of the industry" [38] are represented on the Council.

Appellants, on the other hand, believe that the membership requirements of FACA are violated solely by the fact that 140 members of the Council "are affiliated with the petroleum industry." [39] In appellants' view, such domination in and of itself causes the Council's work to be inappropriately influenced by the petroleum industry and prevents the Council from exercising its independent judgment as required by

28. 5 U.S.C. App. I § 3(2)(C) (Supp.1975).

29. 15 U.S.C. § 776(a) (Supp.1975).

30. Answers to Defendants' Interrogatories Directed to Plaintiff Metcalf, J.A. at A–29–A–30 (hereinafter referred to as Metcalf Answers).

31. 15 U.S.C. § 776(a) (Supp.1975).

32. *Id.* § 776(d).

33. Complaint, ¶ 19, J.A. at A–11.

34. The members of the NPC are appointed by the Secretary of the Interior. "Subgroups" may consist of groups of council members or they may be groups of non-members organized by and responsible to the NPC. These latter groups provide much of the research work for

the reports issued by the Council. See Metcalf Answers, J.A. at A–32, A–33.

Industry domination of the NPC was the historical pattern in the period prior to the effective date of FACA. *See* Brief for Appellee NPC at 5.

35. 5 U.S.C. App. I §§ 5(b)(2), 5(b)(3) (Supp. 1975). These provisions are made applicable to advisory committees such as NPC by *Id.* § 5(c).

36. *See, e.g.,* Brief for Appellee NPC at 6.

37. Supplementary Materials, Attachment B.

38. *Id.*

39. Appellants' Brief at 6–7.

FACA. All of the injuries which appellants assert in this lawsuit flow from this allegedly unbalanced membership of the NPC.[40] As an element of the relief requested by appellants in this case, they seek a declaratory judgment that the membership of the Council is not fairly balanced.[41] In response to interrogatories, the appellants have refused to specify the criteria which the Secretary of the Interior should use in appointing members to the Council in order to ensure the "proper" balance which they seek.[42] Rather, appellants leave this decision as to the proper membership balance *totally* to the discretion of the court.

In the context of this case we need not express a view as to the proper interpretation of the membership provisions of FACA. Rather, for purposes of standing we are required to "accept as true all material allegations of the complaint . . ."[43] Accordingly, we assume that, whether the membership of the NPC is or is not fairly balanced as required by FACA, the Council's advice is indeed inappropriately influenced by the petroleum industry. In Part III we shall examine the critical question as to whether this assumed illegality has *resulted* in any judicially cognizable injury to the appellants.[44]

FACA provides very little guidance as to the manner in which advisory committees are to be funded. The Act requires each agency to keep such records "as will fully disclose the disposition of any funds which may be at the disposal of its advisory committees"[45] but does not specify the source from which these funds are to come. The only express requirement in the statute is that the agency "shall be responsible for providing support services for each advisory committee established by or reporting to it . . . ."[46]

The NPC is, apart from the above-mentioned support services, financed entirely from funds provided by the petroleum industry.[47] Appellants claim that this funding scheme causes the advice of the NPC to be inappropriately influenced by the special interests of the petroleum industry. Thus, appellants do not challenge the NPC funding scheme as such, but contend that it, along with the membership makeup of the Council, cause the NPC to issue biased advice to the agencies which it serves.[48] As noted above, we assume for purposes of standing that the Council is inappropriately influenced in its work. Since appellants' contentions with respect to the NPC's funding merely serve to support this claim, we are not required to make a separate assumption that the funding is illegal as such.

3. *The Review of Advisory Committees.* FACA provides for three separate sources of review to ensure that the network of federal advisory committees is operating as effectively and efficiently as possible. The first source of review is the Congress itself; each standing committee of the Senate and House is required to "make a *continuing*

---

40. *See* Part II, *infra.*

41. Complaint, J.A. at A–13.

42. Metcalf Answers, J.A. at A–18, A–26.

43. *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

44. See *Harrington v. Bush, supra* note 10, at ——, —— n. 41, and —— n. 68 of 180 U.S.App. D.C., at 197, 199 n. 41, and 205 n. 68 of 553 F.2d.

45. 5 U.S.C. App. I § 12(a) (Supp.1975).

46. *Id.* § 12(b).

47. Supplementary Materials, Attachment B; Metcalf Answers, J.A. at A–26.

48. Metcalf Answers, J.A. at A–28–A–29. As part of the relief requested in this suit, appellants request that the Director of OMB conduct a detailed review "of the source and amount of funding of the Council and its subgroups and . . . indicate whether such funding is consistent with the law." Complaint, J.A. at A–15. Appellants provide no standards to guide this determination as to funding legality. This requested relief supports the notion that appellants do not challenge the funding of the NPC as such, but rather complain about the *effect* of the funding on the Council's advice. In appellants' view, both the membership and the funding of the NPC produce the same result—tainted advice.

*review* of the activities of *each* advisory committee under its jurisdiction . . ." [49] Appellant Metcalf is a member of a committee which has such oversight jurisdiction over the NPC.[50] Indeed, this appellant has introduced legislation in the Senate which would alter the membership requirements of FACA by requiring that at least one-third of the membership of advisory committees be drawn from citizens in private life who would represent the interests of the public.[51] This legislation was not enacted. Section 5(a) of FACA specifically grants these standing committees, *inter alia*,[52] the power to abolish advisory committees such as the NPC even though the committees may have been originally chartered by the heads of the various federal executive agencies.[53]

The second source of advisory committee review is the Director of the OMB.[54] FACA requires the Director to conduct an annual comprehensive review of all federal advisory committees and to make recommendations concerning the continuing existence of each.[55] In addition, the Director is charged with establishing administrative guidelines and management controls applicable to all federal advisory committees.[56]

One of the more significant areas in which the Director must issue such guidelines concerns the renewal of advisory committee charters.

FACA provides that advisory committees in existence prior to 5 January 1973 (such as the NPC) shall terminate on 5 January 1975 unless they are renewed by "appropriate action." [57] The Director of OMB has prescribed the renewal procedure for advisory committees.[58] Appellants contend that the Director has violated these guidelines and they seek a declaratory judgment that *all* actions taken by the Council since its original charter expired on 31 December 1974 are unlawful.[59] Appellants seek this declaration apart from the alleged illegalities relating to the membership and funding of the Council. Again, for purposes of standing we assume that the Council's charter was not renewed in accordance with the proper OMB procedure; we also emphasize that this assumed illegality does not in itself confer standing on anyone to challenge it.[60]

In addition to review by the Congress and the Director of OMB, FACA requires the head of a federal agency utilizing an advisory committee to monitor the committee's

**49.** 5 U.S.C. App. I § 5(a) (Supp.1975) (emphasis added).

**50.** See Part IIB, *infra*.

**51.** *See* Brief for Appellee NPC at 45 n. 77 and 55 n. 88.
  This is the only hint which we have as to appellants' conception of a properly balanced Council membership.

**52.** The power of the standing committees in relation to advisory committees is quite broad; FACA specifically grants the committees the power to "take appropriate action to obtain the enactment of legislation necessary . . ." to regulate the advisory bodies. 5 U.S.C. App. I § 5(a) (Supp.1975). In addition, the Congress retains all of its traditional powers related to the "power of the purse" to deal with various aspects of federal advisory committee work.

**53.** 5 U.S.C. App. I § 5(a) (Supp.1975). In their complaint the appellants seek as their relief the reconstitution of the Council's membership. At one point in their submissions to this court, however, appellants state that the remedy they seek is "either a fairly balanced Council or *abolition* of the Council as an advisory body to .

the federal government . . . ." Appellants' Reply Brief at 1 (emphasis added). We doubt whether a court has such power in this context; this is a role assigned to, and more appropriate for, the legislature. The prospect of the courts abolishing advisory committees and thus completely closing off a source of information is disturbing; the flow of information would be halted not only to the litigants who stand before the court but *to all others* as well. *See* discussion in text at notes 124 to 126, *infra*.

**54.** 5 U.S.C. App. I § 7(b) (Supp.1975).

**55.** *Id.*

**56.** *Id.* § 7(c).

**57.** *Id.* § 14(a)(1)(A).

**58.** Metcalf Answers, J.A. at A–24–A–25.

**59.** Complaint, J.A. at A–14.

**60.** See *Harrington v. Bush, supra* note 10, at ——— of 180 U.S.App.D.C., at 197–198 of 553 F.2d.

performance very closely.[61] According to information submitted to this court, the Secretary has taken particular care when discharging this responsibility in examining the membership of the NPC to determine if it is in compliance with FACA.[62] The Secretary plans an annual review of this aspect of the Council's structure.[63] As stated previously, the Secretary believes the Council to be in compliance because the NPC membership represents all viewpoints within the petroleum industry.

The point to be drawn from these review provisions in FACA is that federal advisory committees, and the NPC in particular, undergo close periodic examination by sources both within and without the agencies which charter or utilize the committees. In addition, the committees of Congress are given very broad power to correct what they may perceive to be *any* difficulty in the operation of the advisory committees and are *required* by the statute to exercise their review power on a *continuing* basis. Also, it is appropriate to observe that those who are charged with the responsibility to review advisory committee activities by FACA are more closely associated with and possess more expertise in the subject areas in which the various advisory committee operate than the federal courts.[64]

### B. *The Operation of the Council*

In order to understand the nature of appellants' challenge in this case, it is necessary to outline the manner in which the NPC operates. First of all, the Council provides advice only when requested to do so by the Secretary of the Interior or some other agency head; the initiative always flows *from* the agency *to* the advisory committee.[65] When advice has been requested, the subgroups of the Council research and write a report on the subject in question. This report is then presented to the full Council which approves it for transmission to the federal agency.[66]

The NPC provides advice only to federal agencies; the Council, as it presently exists, has no direct input into the Congress. The Council's advice is used by the DOI and other agencies to formulate their own policy positions on the various issues which they must face. It may appear obvious to most that an advisory committee exists *to advise* and *not to decide*. Nevertheless, Congress chose to emphasize this point in FACA by stating that

> advisory committees shall be utilized *solely for advisory functions*. Determinations of action to be taken and policy to be expressed with respect to matters upon which an advisory committee reports or makes recommendations shall be made *solely by the President or an officer of the Federal Government*.[67]

The NPC Charter also contains a provision to this effect.[68] It is true that the DOI relies on the work of the Council and views it as being of "inestimable value" to the Department,[69] but the basic point remains that the NPC does not formulate or make policy on its own. Rather it is *one source* of information on which a federal agency can draw in making *its* own policy decisions or in making recommendations to the Congress. Appellants seek to enjoin the Coun-

the grounds that *no one* can seek judicial review of the issues presented in this case.

---

**61.** 5 U.S.C. App. I § 8 (Supp.1975).

**62.** Supplementary Materials, Attachment B.

**63.** *Id.*

**64.** Appellee NPC contends that Congress intended to preclude judicial review of the type sought in this litigation. Brief for Appellee NPC at 59–64. We express no view on this question; rather, we make the statement that the courts are not as qualified at performing this type of review as the entities named in FACA. We rest our decision in this case on a denial of standing to *these appellants*, not on

**65.** See note 24, *supra*.

**66.** Appellants' Brief at 8.

**67.** 5 U.S.C. App. I § 9(b) (Supp.1975) (emphasis added).

**68.** NPC Advisory Committee Charter, J.A. at A–48.

**69.** Supplementary Materials, Attachment B.

cil from furnishing *any*[70] further advice to the DOI, the FEA, or other federal agencies until the membership of the Council is reconstituted in some court-approved fashion.[71]

Having described the nature of appellants' challenge in this case, and having made the necessary assumptions as to the illegality of the Council's membership, we now turn to an examination of the injuries which appellants believe to be caused by this assumed illegality.

## II. THE INJURIES ASSERTED BY APPELLANTS

### A. Consumer and Citizen Injuries

Appellants assert three injuries in their status as consumers and citizens. First, it is alleged that appellants "*will pay* [higher costs] for petroleum products because the Council and all of its subgroups are unlawfully dominated by the petroleum industry."[72] In appellants' view the higher prices will result in part from the Council's failure to address the issue of consumer prices fairly or adequately in its reports to the DOI and the FEA;[73] his deficient advice *in turn* causes the DOI and the FEA to formulate policies which "affect the pricing of petroleum products. . ."[74] Appellants do not specify the way in which Council advice is unfair or inadequate with respect to consumer prices; the unfairness

and inadequacy presumably result solely from the fact that the Council is composed primarily of petroleum industry personnel. Appellants do not allege that the burden of any future increased costs will fall on them in a disproportionate manner, nor do they specify the monetary loss associated with the asserted prospective injury.[75]

The second consumer injury alleged by appellants concerns the availability of alternative energy sources and supplies. Appellants aver that the Council's advice is favorable to the petroleum industry and causes the DOI and the FEA to minimize the advantages of alternative energy sources when they formulate policy.[76] These agency policies *in turn* cause the appellants to "be denied the lower costs, efficiencies, and enjoyment of [alternative] energy sources."[77] As support for this contention, appellants point to two NPC reports in which they feel that alternative energy sources were "inadequately addressed."[78] In addition, appellants focus on the offshore exploration and drilling for oil. They state that such activity has been vigorously urged by the Council in its advice to the DOI, and that the DOI is "now engaged in promoting an accelerated offshore drilling program."[79] The effort and resources which the DOI uses in support of this program in turn detract from the effort and resources which *could be* used to promote and develop "other cost-saving energy al-

---

**70.** Appellants seek to terminate all contacts between the NPC and federal agencies until the membership is reconstituted. This includes formal and informal contacts, and oral or written communications. Complaint, J.A. at A–14. This broad relief is requested because appellants believe they are injured each time there is any contact whatsoever between the NPC and the federal agencies. *See* Metcalf Answers, J.A. at A–23, A–24.

**71.** As a corollary to this requested relief, appellants seek an injunction prohibiting agency heads from *requesting* any advice from the NPC. Complaint, J.A. at A–14.

**72.** Complaint, ¶ 3, J.A. at A–4 (emphasis added). Most of the injuries asserted in this category of consumer and citizen interests are expressed by the two appellants in nearly identical language. In such cases we will cite to only one source. When the interests or injuries

diverge in any substantive respect, we shall refer separately to appellants Metcalf and Brown.

**73.** Appellant's Brief at 33.

**74.** *Id.* at 34.

**75.** *Id.* at A–18. Appellants state that they are unable to provide any information relating to the costs involved in the contentions relating to higher prices for petroleum products.

**76.** Complaint, ¶ 3, J.A. at A–5.

**77.** *Id.*

**78.** Metcalf Answers, J.A. at A–20.

**79.** Affidavit of Appellant Metcalf, J.A. at A–44.

ternatives."[80] This failure to concentrate maximum effort on the development of alternative energy supplies is the source of the injury alleged by appellants. Here again, appellants do not provide any evidence as to the potential monetary loss associated with this asserted consumer injury.

The third injury in this category relates to environmental damage and threats to health and safety that are associated with petroleum products.[81] Again, appellants allege that these subject areas have not been adequately considered by the NPC because of its allegedly unbalanced membership, thus setting in motion a chain of causation which ultimately inflicts environmental injury and threats to health and safety on them. In particular, appellant Metcalf avers that "my use and enjoyment of my property [on Chesapeake Bay] is threatened by the biased advice of the Council to [DOI] that deepwater loading and unloading ports generally be developed."[82] Appellant Brown refers to "oil spillages on the beaches where he desires to swim,"[83] and states that he "rejected vacationing in the Santa Barbara, California area in part . . . because of the *possibility* that [oil] spillages may recur there. . . ."[84] In addition appellant Brown complains that "the *projected* oil tanker route from Alaska to Puget Sound is a threat to healthy swimming in the Puget Sound area he frequents."[85] The most specific allegation involving the Council's activities is that it "recommended to [DOI] that in certain situations air quality controls be relaxed, in-

cluding sulfur level limits, which adversely affects the air I breathe in and around the Washington, D. C. area."[86] There is no allegation that DOI took action based on this recommendation.

In addition to the alleged environmental injuries noted above, appellant Brown also asserts injuries related to "aesthetic blight."[87] First, he asserts that he has "viewed the aesthetically unappealing oil refining and storage complexes" along the New Jersey Turnpike;[88] second, he "regularly is exposed to the unsightly oil pumps strewn on the various home sites and other properties near his home town in north central Ohio",[89] and third, he is offended by the "strong and unpleasant odors emanating from pumps located nearby in the area of Mount Gilead, Ohio."[90] Appellant contends that *unspecified* Council advice has caused these injuries.[91]

There is an additional asserted injury in this consumer and citizen category which deserves mention in order to place the appellants' case in true perspective. Appellants contend that the alleged lack of fair balance on the NPC results in, among other things,[92] "the possible increased risk of conflict between nations."[93] Appellants do not, of course, specify when such conflicts may take place or how the Council's advice will cause such upheaval. We state this asserted injury primarily to show the extraordinary consequences which appellants attach to the advice given by the NPC.

80. *Id.*

81. Complaint, ¶ 3, J.A. at A–4.

82. Metcalf Answers, J.A. at A–44.

83. Complaint, ¶ 4, J.A. at A–6.

84. Appellant Brown's Response to Interrogatories, J.A. at A–39 (emphasis added) (hereinafter Brown Answers).

85. *Id.* (emphasis added).

86. Appellant Brown's Affidavit, J.A. at A–46.

87. Complaint, ¶ 4, J.A. at A–6.

88. Brown Answers, J.A. at A–39.

89. *Id.*

90. *Id.* at A–40.

91. *Id.*

92. See Metcalf Answers, J.A. at A–18. These include the potential safety risks associated with petroleum storage.

93. *Id.*

The unifying theme which underlies the injuries outlined in this section concerns the reason why the alleged injuries have taken place. With respect to all three, appellants claim to have been injured on the theory that the challenged structure of the NPC causes it to make certain biased recommendations, which in turn cause government agencies to adopt policies favoring the petroleum industry, which in turn cause the appellants to be injured as consumers and citizens.

## B. Injuries Related to Senate Work.

Appellant Metcalf claims three injuries in his capacity as a United States Senator. First, he claims that his previously cast votes in favor of FACA and FEAA have been "effectively nullified" by the alleged lack of fair balance in the membership of the NPC.[94] Second, appellant Metcalf alleges that until the legal issues surrounding the operation of the NPC are resolved by a federal court, he "is uncertain how best to take effective legislative action to correct the illegalities he perceives."[95] Appellant Metcalf relies solely on this court's decision in Mitchell v. Laird[96] as support for the acceptability of this second injury as a basis for legislator standing. Third, appellant alleges that the imbalance of the NPC has caused him injury in his committee work in the Senate.[97] In view of our opinion in Harrington v. Bush, we conclude that the first two asserted injuries do not satisfy the constitutional requirement of injury in fact.[98] We therefore turn our attention to appellant Metcalf's contention that

he has been injured in his Senate committee work.

Appellant Metcalf is a member of the Senate Committee on Interior and Insular Affairs and is Chairman of its Subcommittee on Minerals, Materials and Fuels.[99] This subcommittee has "major responsibility . . . in the Senate's task of developing national policies on fuels and other energy matters."[100] Appellant Metcalf is also a member of two other Interior Committee subcommittees which deal with issues on which the NPC renders advice.[101] Although he contends that all of his committee work suffers because of the allegedly tainted and biased advice of the NPC, appellant Metcalf focuses primarily on his work as a subcommittee chairman in describing the injury done to him as a Senator.

In the process of developing national policies and legislation on energy-related matters, appellant Metcalf's subcommittee holds hearings and obtains data and recommendations from the DOI, the FEA, and other sources.[102] The NPC does not testify or otherwise provide data or advice directly to this subcommittee.[103] Appellant complains that, since the DOI and FEA rely on advice from the Council, the input which these two federal agencies have into his subcommittee is biased and tainted to the extent that the agencies' views reflect the Council's advice. By relying on the recommendations of DOI and FEA which may have been developed on the basis of Council advice, appellant alleges that he "is impeded in his efforts to develop the best possible

We emphasize that we conclude that appellant Metcalf has alleged no injury in fact to his status as a Senator. We need not therefore pose or answer the inquiries relating to the zone of interest to be protected, causation, and redressability. See Harrington v. Bush, supra note 10, at —— n. 68 of 180 U.S.App.D.C., at 205 n. 68 of 553 F.2d.

94. Complaint, ¶ 3, J.A. at A–5.

95. Appellants' Brief at 29.

96. 159 U.S.App.D.C. 344, 488 F.2d 611 (1973).

97. Complaint, ¶ 3, J.A. at A–5.

98. With respect to the contention that the previously cast votes have been nullified, see our discussion in Harrington, supra note 10, at ———–——, —— of —— U.S.App.D.C., at 211, 207–210 of 553 F.2d. For a discussion of our disapproval of the Mitchell standard for legislator standing, see Harrington, supra note 10, at ———–——, at 207–210 of 553 F.2d.

99. Metcalf Answers, J.A. at A–22, A–23.

100. Id.

101. Id.

102. Id.

103. See note 67, supra.

*legislative product."*[104]   This is the injury which appellant Metcalf believes to be sufficient to confer standing on him as a Senator.

It is necessary to make several additional observations concerning appellant Metcalf's claim of legislator standing.   First of all, appellant admits that he has "other sources"[105] than DOI or FEA that could be utilized by his subcommittee in gathering data and advice on energy-related matters. Curiously, however, appellant contends that he is under no legal obligation to employ these additional sources in order to mitigate any bias he perceives in the Council's input into DOI and FEA or these agencies' input into Congress.[106]  Appellant asserts that he relies on DOI and FEA input even though he firmly believes the Council advice to these agencies to be biased and tainted and therefore is misled in his committee work to the detriment of his status as a Senator.  It may well be that appellant Metcalf is under no obligation to consult other sources, but his tenacious insistence on reliance on agency advice which he thoroughly disbelieves certainly undermines his concern with developing the "best possible legislative product."

Appellant Metcalf does not contend that the investigatory or information-gathering powers of his subcommittee have been circumscribed in any manner because of the alleged illegality of the NPC's operation. In addition, he in noway specifies the characteristics of the "best possible legislative product" which he seeks to develop so that the impact of the Council's advice on the product can be delineated.   Indeed, appellant points to no specific legislation which has been impaired by the Council's actions; rather, the asserted injury relates to appellant's subjective judgment as to the quality of legislation which his subcommittee can produce under present circumstances.

## III.  ANALYSIS OF APPELLANT'S INJURIES

### A.  Consumer and Citizen Injuries

With respect to the three injuries asserted by appellants in their capacity as consumers and citizens, we conclude that appellants have not met the constitutional requirement of injury in fact and therefore have no standing to maintain this action. Although there are obvious problems in this case related to causation and redressability of the grievance, we need not face these issues since the basic constitutional threshold of injury in fact has not been satisfied.[107]

The major defect in the allegations related to consumer and citizen injury is that the occurrence of the asserted harm is speculative and conjectural *in the purest sense.*[108] The clearest example of this is found in the allegations relating to alternative energy sources.   It is impossible to know whether or when these sources will provide cheaper energy than petroleum products, or what the potential savings, economic and otherwise, might be.   The same can be said of the anticipated higher prices for petroleum products which appellants claim they will pay as the result of biased Council advice. The occurrence or extent of any price rise cannot be determined at this point.[109]   To

---

104.   Metcalf Answers, J.A. at A–23 (emphasis added).

105.   See note 102, *supra.*

106.   Metcalf Answers, J.A. at A–24.

107.   *Schlesinger v. Reservists to Stop the War,* 418 U.S. 208, 227 n. 16, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974).   *See also Harrington v. Bush, supra* note 10, at —— n. 68 of 180 U.S.App.D.C., at 205 n. 68 of 553 F.2d.

108.   *See Golden v. Zwickler,* 394 U.S. 103, 109, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969);  *O'Shea v.*

*Littleton,* 414 U.S. 488, 497, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

109.   The fact that appellants cannot specify in any way the monetary losses associated with their asserted consumer injuries detracts greatly from the strength of their standing argument.   The injury needed for standing does not have to be substantial, but it must be at least *identifiable,* see *United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973). Any information relating to the costs inflicted on appellants in this case would serve to establish that *some* injury does in fact exist.

allow standing based on these speculative injuries would undermine the basic policy in the law of standing which seeks to ensure the "concrete adverseness" [110] which is necessary to satisfy the "cases or controversies" limitation of Article III.

Appellant's consumer injuries result from what they perceive to be the Council's failure to address the issues of price and alternative energy sources in an "adequate" manner.[111] Such a contention is purely subjective in nature; there are no readily discernible standards to determine when a Council report has "inadequately addressed" a particular issue. The standing claim must also fail because of the presence of this subjectivity in appellants' contentions.[112]

The allegations relating to environmental injury are also *purely* speculative; with respect to each of these there is a pervasive "uncertainty about whether the alleged injury will be likely to occur." [113] It could be argued that an oil spillage is inevitable in areas where the appellants might live on vacation; still, any personal injury which such an occurrence may inflict on appellants is speculative and remote, not real and immediate. The mere occurrence of the type of environmental dangers and risks which concern appellants does *not* necessarily mean that *appellants* will suffer a particularized, injurious impact as a result.

The asserted injuries with respect to aesthetic and health and safety concerns, in addition to being speculative, are also abstract in nature. For example, the claims that biased Council advice causes risks related to petroleum storage and the increased possibility of conflict between nations are amorphous at best. These asserted injuries lack that "essential dimension of specificity" [114] necessary to support a claim of standing and fit well within the Supreme Court's clear directive that "[a]bstract injury is not enough." [115]

The appellants asserted injuries with respect to higher petroleum prices, the unavailability of alternative energy sources, and aesthetic blight, *if* they were to occur, would likely be of the type "held in common by all members of the public" [116] and thus insufficient as a basis for standing. The fact that many are injured does not, of course, preclude an individual party from being granted standing.[117] That individual party must, however, be able to allege and prove "a distinct and palpable injury to himself" [118] as the threshold requirement for standing. Appellants have not shown that they would be able to do this with respect to these injuries.

### B. *Injuries to Senate Work*

With respect to appellant Metcalf's asserted injuries to his Senate committee work, we conclude that there has been no judicially cognizable injury stated. This conclusion flows from the fact that appellant has alleged no *"particular* concrete injury"* [119] which amounts to "a claim of *specific* present *objective* harm or a threat of

---

**110.** *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

**111.** Metcalf Answers, J.A. at A–20.

**112.** *See Laird v. Tatum*, 408 U.S. 1, 13–14, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972).

**113.** *O'Shea v. Littleton*, 414 U.S. 488, 498, 94 S.Ct. 669, 677, 38 L.Ed.2d 674 (1974).

**114.** *Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, 221, 94 S.Ct. 2925, 2932, 41 L.Ed.2d 706 (1974). We wish to emphasize at this point that injury in fact certainly *can* be based on harm done to environmental, aesthetic, and health and safety interests. But such harm cannot be of the speculative and abstract nature presented by appellants in this case.

**115.** *O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).

**116.** *Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, 220, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974).

**117.** *See United States v. SCRAP*, 412 U.S. 669, 686, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

**118.** *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

**119.** *United States v. Richardson*, 418 U.S. 166, 177, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974) (emphasis added).

*specific* future harm." [120]  Rather, appellant presents a generalized grievance that a particular source of information which is relied upon by those who appear before and submit information to his subcommittee is not of the quality that it should be.  Any detrimental effects of this allegedly biased information will occur at some unspecified time in the future; in addition, the nature of any prospective impact is equally unspecified and indeterminate.  The effects of the Council's advice simply have not been traced into "the context of a specific live grievance." [121]  Appellant's failure to allege specific injury convinces us that he has not, in the words of the Supreme Court in *Baker v. Carr*, "alleged such a personal stake in the outcome of the controversy as to assure [the] concrete adverseness which sharpens the presentation of issues  . .." [122]  Appellant Metcalf makes much of the fact that his asserted injuries relate to his legislative responsibility in a *specific* subject area and on a *specific* subcommittee. [123]  In so arguing, appellant misconceives the nature of the specificity requirement in the law of standing.  It is the *injury* which must be specific, *not* merely the interest on which the injury has been inflicted.  Thus, the injury alleged by appellant Metcalf is not of the type of which we can take cognizance and still remain within the constitutional limitations imposed by Article III on the federal courts.

An additional objection to appellant Metcalf's claim to standing as a Senator relates to the purely subjective nature of his asserted injury.  As noted previously, appellant's injury derives from his belief that he cannot produce the "best possible legislative product" because of the Council's allegedly tainted advice.  There are *no* objective standards to determine when a legislative product is the "best" that it can be; such a determination necessarily rests on each legislator's individual view of the countless variety of factors which go into the formulation of legislation.  Were we to accept the pure subjectivity put forth by appellant Metcalf in his capacity as an individual legislator, the federal courts would become a forum for the vindication of value preferences with respect to the quality of legislation enacted by our national legislature.  Such a role for the courts is clearly inconsistent with the "cases or controversies" limitation of Article III.

The subjective nature of appellant Metcalf's claimed injury is particularly disturbing in the context of this case.  This case is concerned with the flow of information— *from* those who have particular expertise in given subject areas *to* those who formulate government policy.  Indeed, Congress specifically stated in FACA that advisory committees, such as the NPC, are "a useful and beneficial means of furnishing expert advice, ideas, and *diverse opinions* to the Federal Government." [124]  One would hope that any governmental entity which formulates national policy, be it DOI, FEA, the Congress or any other group, would seek out, consider and balance all available information before arriving at final decisions.  In this case, appellant Metcalf seeks to eliminate or alter a particular source of information so that he can produce what he believes to be the "best possible legislative product."  The relief which appellant requests would not only prevent council advice from eventually flowing to appellant himself, but it would deny this information to *all of his colleagues* in the Congress and to the federal agencies which have found it to be of "inestimable value." [125]  If subjective feelings of injury were sufficient to confer standing, the rather drastic consequences of a curtailed information flow could result

**120.**  *Laird v. Tatum*, 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972) (emphasis added).

**121.**  *Golden v. Zwickler*, 394 U.S. 103, 110, 89 S.Ct. 956, 960, 22 L.Ed.2d 113 (1969).

**122.**  369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

**123.**  Metcalf Answers, J.A. at A–22, A–23.

**124.**  5 U.S.C. App. I § 2(a) (Supp.1975) (emphasis added).

**125.**  See note 69, *supra*.

quite easily and often. We do not mean by this that advisory committees cannot by their actions inflict judicially cognizable injuries on individuals; rather, we express this concern to show the particular need for the requirement of *objective* harm in this case.[126]

Appellant Metcalf's asserted injuries relating to his Senate committee work are generalized and subjective complaints about the operation of the legislative process; these complaints are quite different from those presented in *Kennedy v. Sampson* [127] on which appellant places primary reliance.[128] In this case appellant has alleged no diminution in his power as an individual legislator or as a subcommittee chairman. Appellant Metcalf, in his capacity as a subcommittee chairman, continues to have the unimpaired power to develop a variety of sources of information which do not in any way depend on the NPC. The appellant's *power to act* to acquire what he believes to be accurate, competent, balanced and unbiased information is completely intact.[129] In the words of this court in the *Kennedy* case, appellant's *"official* influ-

ence upon the legislative process . ." [130] is undiminished as a result of the alleged illegality associated with the NPC.

Appellant Metcalf believes that a denial of standing to him in his capacity as a Senator would "close the door to all suits, under virtually any circumstances, brought by federal legislators in federal courts. . . . [131] This is clearly not the effect of our denial of standing in this case. Appellant Metcalf has merely failed to meet the minimum constitutional requirement of injury in fact, a standard to which all litigants, regardless of status, are held in the federal courts. The federal courts are open to all litigants who can satisfy the requirements of the standing doctrine as developed by the Supreme Court. Appellant Metcalf's particular claim of legislator standing in this case fails to meet these requirements.

## IV. CONCLUSION

The Supreme Court has stated that the standing doctrine "is founded in concern about the proper—and properly limited—role of the courts in a democratic

---

**126.** Appellant Metcalf contends that we are required to accept the premise "that [he] is harmed [in his capacity as a Senator] by biased information furnished to him by appellees." Appellants' Brief at 27–28. Appellant Metcalf is *clearly* wrong in this assertion. We are not required to accept *any* allegation of harm; if we were to do this, the court would have no function in determining whether the constitutional requirement of injury in fact has been met.

Although we need not accept appellants' allegations with respect to his subjective state of mind, we are required to accept as true all material allegations and to "construe the complaint in favor of the complaining party," *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). We have taken particular care to do just this in Part I, *supra*; even by so construing the complaint, we have determined that there is no injury in fact which results from the assumed illegality.

**127.** 167 U.S.App.D.C. 192, 511 F.2d 430 (1974). In the *Harrington* opinion, we state that "[t]he court's inquiry in *Kennedy* was limited to a discrete aspect of the process by which a bill becomes law (the actual vote on the legislation) and those post-enactment events denying the bill's status as law . . . ." At —— of 180 U.S.App.D.C., at 211 of 553 F.2d. Thus, the

*Kennedy* case is obviously different from the case posited by appellant Metcalf. Appellant Metcalf seeks to read *Kennedy* as dealing with the generalized legislative process. We rejected this view in the *Harrington* case. The fact that appellant Metcalf does not come within the *Kennedy* holding is not fatal to his standing claim; the fact that he has alleged no injury in fact is, however, fatal.

**128.** Appellants' Brief at 16–17; Appellants' Reply Brief at 3.

**129.** We do not make this statement in the belief that merely because appellant can pursue an alternative remedy in the legislative process, he has suffered no injury in fact. The existence of alternative remedies is *not* conclusive on the issue of injury in fact. *Cf.* Appellees' Brief at 31. Rather, we point to these undiminished powers to support the conclusion that appellant has suffered no specific, demonstrable injury in his capacity as a Senator. *See Harrington v. Bush, supra* note 10, at —— n. 41 of 180 U.S.App.D.C., at 199 n. 41 of 553 F.2d.

**130.** 167 U.S.App.D.C. 192, 198, 511 F.2d 430, 436 (1973) (emphasis added).

**131.** Appellants' Reply Brief at 7.

society." [132]   The requirements relating to standing have been developed to ensure that a party invoking a federal court's jurisdiction does not do so in a manner inconsistent with the Constitution or sound prudential limitations.   If we were to accept appellants' speculative, conjectural, generalized injuries in this case as sufficient for standing we would be called upon to supervise the membership and funding of federal advisory committees on a continual basis and to alter the composition of these committees according to our subjective determinations as to "fair balance."   Such a role as the "continuing monitors of the wisdom and soundness of Executive action" [133] is clearly inappropriate for the courts.

*Affirmed.*

---

**132.**   *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).

**133.**   *Laird v. Tatum,* 408 U.S. 1, 15, 92 S.Ct. 2318, 2326, 33 L.Ed.2d 154 (1972).