**Mickey EDWARDS, Member of Congress-Oklahoma, et al., Plaintiffs,**

v.

**James Earl CARTER, President of the United States, Defendant.**

Civ. A. No. 77–1733.

United States District Court, District of Columbia.

Feb. 20, 1978.

1280

Daniel J. Popeo, Joel D. Joseph, Paul D. Kamenar, Washington Legal Foundation Washington, D. C., for plaintiffs.

David J. Anderson, Steven I. Frank, Brook Hedge, Attys., Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge.:

Article IV, Section 3, Clause 2, of the United States Constitution provides in part that the "Congress shall have Power to dispose of . . . the Territory or other Property belonging to the United States." In this proceeding Representative Mickey Edwards and fifty-nine other Members of the House of Representatives appear in their official capacity and seek vindication of their allegedly mandated right under Article IV to vote on the disposition of United States property within the Panama Canal Zone.

Currently pending before the Senate for ratification is a treaty, signed by President James Earl Carter, which would transfer certain real property in the Canal Zone from the United States to the Republic of Panama. Plaintiffs contest the procedure by which the President seeks approval of this treaty, and one other. Specifically, they request this Court to issue a declaratory judgment that the President's actions deprive the United States of property without the prior concurrence of the entire Congress, thereby thwarting them in the performance of their duties as directed by the Constitution; and that the President should transmit the treaties to the House of Representatives for its consideration under Article IV, thereby permitting plaintiffs to exercise their constitutional and legislative duties regarding the disposition of American property within the Canal Zone. Jurisdiction here rests on sections 1331, 1361 and 2201 of Title 28 of the United States Code.

As an initial response, the defendant contends that the Court lacks subject matter jurisdiction either because the plaintiffs have no standing to sue or because the case presents a nonjusticiable political question. In addition, the President's counsel alleges that the complaint fails to state a claim upon which relief can be granted, since Congressional power under Article IV to dispose of United States property is not exclusive in the field of foreign relations, but rather concurrent with the President's Article II treaty making power. Accordingly, the defendant has moved to dismiss the complaint pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

The Court has considered the memoranda and oral argument of counsel and concludes that the plaintiffs lack standing to maintain this action. The defendant's motion must be granted and the complaint dismissed for lack of subject matter jurisdiction.

### Background

The 1903 Hay-Bunau-Varilla Treaty between the United States and the Republic of Panama granted to the United States perpetual rights to "the use, occupation and control" of the Canal Zone.[1] This treaty, as amended,[2] provides the basis for the present American operation, maintenance and defense of the Canal. The treaty has been a source of constant conflict between the two nations. In 1964, President Lyndon Johnson took affirmative steps to initiate renegotiation, a goal which has been pursued by subsequent administrations.

Thirteen years of negotiations culminated on September 7, 1977, when President Carter signed two treaties: the Panama Canal Treaty and the Treaty Concerning the Permanent Neutrality and Operation of the Panama Canal.[3] Upon entry into force, the Panama Canal Treaty would abrogate prior treaties and the Republic of Panama would assume territorial sovereignty over all real property in the Canal Zone, including nonremovable improvements thereon. The United States would continue to operate the Canal until the turn of this century, year 2000, at which time Panama would take control. Under the terms of the latter treaty, the United States and Panama would share permanent responsibility for maintaining Canal neutrality.

While there is some question as to the status of the interests to be transferred, the Court will assume for purposes of this motion to dismiss that the treaties concern property and territory of the United States, as those terms are used in Article IV of the Constitution.

President Carter submitted the treaties to the Senate for advice and consent to ratification in September, 1977. On February 3, 1978, after extensive hearings, the Senate Committee on Foreign Relations reported the treaties to the Senate; the Committee concluded that the Panama Canal Treaty can validly transfer property of the United States without the need for implementing legislation.[4] The Senate is currently conducting debate on the treaties; if approved and ratified, they will enter into force six months after the exchange of American and Panamanian instruments of ratification.

### The Question of Standing

■ To cross the jurisdictional threshold of the federal court, the Representatives must first demonstrate their standing to seek a declaration that President Carter's submission of the treaties only to the Senate is unconstitutional. Although legislator interests and injuries are often specialized, there are no distinct standards for deter-

---

1. Isthmian Canal Convention, Nov. 18, 1903, 33 Stat. 2234, T.S. No. 431.

2. General Treaty of Friendship and Cooperation, March 2, 1936, 53 Stat. 1807, T.S. No. 945; Treaty of Mutual Understanding and Cooperation, Jan. 25, 1955, 6 U.S.T. 2273, T.I.A.S. No. 3297.

3. For the text of the proposed treaties, see Dep't State Selected Documents No. 6 (Sept. 1977).

4. Senate Comm. on Foreign Relations, Report on the Panama Canal Treaties, Exec. Rep. No. 95–12, 95th Cong., 2nd Sess. 65–69 (1978).

mining Congressional standing questions. To resolve the ultimate issue of whether "the plaintiff has shown an injury to himself that is likely to be redressed by a favorable decision," *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976), the Court must pursue a series of inquiries. Only recently, in *Harrington v. Bush*, 180 U.S.App.D.C. 45, 60 n. 68, 553 F.2d 190, 205 n. 68 (1977), our Court of Appeals distilled four separate such questions from the Supreme Court decisions developing the standing doctrine. First, does "the irreducible constitutional minimum" of a concrete injury in fact exist? Second, are the interests asserted arguably within the zone of interests protected by the relevant statute or constitutional provision? Third, is the injury asserted causally related to the allegedly illegal action of the defendant? Finally, is the injury "likely to be redressed by a favorable decision?"

This Circuit has developed a relatively comprehensive body of law on the subject of legislator standing. A definite line between legislators with and without a sufficient injury in fact has been drawn. While the sixty plaintiff House Members do not fall neatly on either side of that line, a discussion of the division will lay the foundation for a comparative analysis.

■ A Congressman whose vote has actually been nullified has standing to challenge the action that has led to such nullification. In *Kennedy v. Sampson*, 167 U.S. App.D.C. 192, 511 F.2d 430 (1974), the court held that Senator Edward Kennedy had standing to challenge the constitutionality of the President's exercise of a "pocket veto" on a bill passed by Congress. The court emphasized that the pocket veto had both nullified the effect of his prior vote for the bill and had circumvented his opportunity to cast an overriding vote, thus causing a specific injury to his "official legislative authority." Because a decision as to the constitutionality of the pocket veto would determine whether the bill would become law, the court was not playing a solely advisory role, outside the scope of its Article III powers. *See also Coleman v. Miller*, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939).

In contrast to *Kennedy*, the court has been reluctant to find standing where a legislator is not seeking viability for a specific vote already cast or a constitutionally prescribed follow-up vote. In the central case of *Harrington v. Bush*, House Representative Michael Harrington challenged the legality of certain activities of the Central Intelligence Agency (CIA). Citing the key language of *Mitchell v. Laird*, 159 U.S. App.D.C. 344, 488 F.2d 611 (1973), plaintiff based standing on his belief that a judicial declaration of the illegality of the activities would "bear upon" his legislative duties of impeachment and appropriations. The court unequivocally rejected the *Mitchell* relevance test and held that a Congressman who seeks a declaratory judgment of executive illegality must allege a "particular concrete injury." 180 U.S.App.D.C. at 65, 553 F.2d at 210. Congressman Harrington did not meet this initial barrier, because he could point to no action by CIA officials that had undermined his vote. Indeed, the "legislative process [was] operating in an unimpeded manner," as the House was considering numerous bills and resolutions relating to the CIA. *Id.* at 55 n. 41, 553 F.2d at 200 n. 41. In addition, since a judgment either way as to the legality of CIA activities would only assist Congressman Harrington in his general legislative duties, rather than deciding the fate of specific legislation, a judgment could serve solely an advisory function.

The importance of the *Harrington* "particular concrete injury" test was buttressed in the companion case of *Metcalf v. National Petroleum Council*, 180 U.S.App.D.C. 31, 553 F.2d 176 (1977). Senator Lee Metcalf sought to enjoin the National Petroleum Council from functioning as a federal advisory council because its advice was allegedly influenced by special interests, in violation of two federal statutes. He claimed that his duties as an individual legislator and as a subcommittee member to take "effective legislative action to correct the illegalities

he perceive[d]" were impaired by receipt of biased information from the defendant. Finding this to be a generalized grievance with an unspecified prospective impact, rather than an injury in fact, the court denied standing and noted that Senator Metcalf was free to develop sources of unbiased information to assist him in his legislative role.

◾ The Court of Appeals also used *Metcalf* to clarify the distinction between the *Harrington* and *Kennedy* situations. Where a legislator's "official influence upon the legislative process" is not impaired by alleged illegality, though one channel of power or source of information may be hampered, he has no standing to entangle the federal court in his general legislative difficulties. A legislator in the *Kennedy* type case has standing, however, where the court can limit its inquiry to the "discrete aspect" of the process by which a bill becomes law, meaning the original vote and post-enactment events denying a bill's legal status. *Id.* at 44 n. 127, 553 F.2d at 189 n. 127.

### Plaintiffs' Standing

The Representatives describe, somewhat ambiguously, two classes of injury for which they seek redress. Their complaint alleges that the President's failure to submit the treaties to the House has infringed their "constitutional and legislative responsibilities to dispose of property belonging to the United States." This allegation appears to encompass not only the injury inherent in actual transfer of Canal Zone property without House approval, but also the President's submission of the treaty property provisions to the Senate only. In the opposition to the motion to dismiss, they also assert a "constitutional interest in protecting the integrity of their votes" on specific bills and resolutions now pending before the House, which concern substantive and procedural aspects of Panama Canal property disposition.[5]

The two concepts of injury warrant separate discussion. Because the latter presents the less difficult issues, the Court will first address that concept of injury.

### Specific Bills and Resolutions Pending Before the House

◾ Plaintiffs' claim that President Carter's actions encroached upon their right to vote effectively on specific bills and resolutions pending before the House represents an attempt to come within the holding of *Kennedy v. Sampson*. The *Kennedy* court, however, was not impressed with the specificity of legislation upon which a legislator hoped to vote. Rather, the controlling factor was that Senator Kennedy's actual vote on a bill had been nullified by improper executive action; impairment of his future vote was inextricably linked to his original one. As confirmed in *Metcalf*, where the plaintiff emphasized the specificity of the subject matter involved, "[i]t is the *injury* which must be specific, *not* merely the interest on which the injury has been inflicted." *Id.* at 43, 553 F.2d at 188.

However specific the bills and resolutions here, plaintiff Representatives are in no stronger a position for standing than were Senator Metcalf or Representative Harrington. President Carter has not frustrated or prevented them from voting. If the relevant bills and resolutions are snared in the legislative process, they have only their colleagues and themselves to blame. *See Reuss v. Balles*, 73 F.R.D. 90, 94–97 (D.D.C. 1976), *appeal pending*, No. 77–1012 (D.C. Cir.). The Court recognizes that plaintiffs might welcome a judicial declaration of the constitutional status of the defendant's actions before considering or voting on the legislation now pending. However, since a judicial decision concerning the bills and resolutions would not determine whether the territory is to be transferred or even whether the House merits a vote on the actual Panama Canal Treaties, such a decision would exceed the Court's Article III powers.

---

5. Three bills (H.R. 9815, H.R. 8957, H.R. 8790) and eleven resolutions were all introduced in the 95th Congress, 1st Session.

The Court also recognizes that a Senate vote on the treaties could undermine the effectiveness of a House vote on the now pending bills and resolutions. In response to this dilemma, however, the Court points out that it would be improper for the federal judiciary to attempt to schedule the legislative process. Nor will the Court attempt to monitor the interrelationship of the House and Senate, particularly since the latter body is not a party to this litigation.

*Panama Canal Treaties*

The heart of this action is plaintiffs' alleged constitutional right to cast an effective vote on the treaty provisions transferring American territorial control of Canal Zone property. The asserted injury to the Representatives arises from the President's attempt to modify the status quo of property and territory ownership, as established by past treaties and legislation, without a House vote. This injury would magnify in the immediate future if the treaties are ratified. So articulated, the plaintiffs have suffered an injury to their role in the legislative process under Article IV. However, to support standing, they must further demonstrate a concrete and nonspeculative injury in fact to their official roles as legislators.

■ Plaintiffs' alleged injury does not fall into either of the legislative standing categories. They concede that defendant has not nullified the effect of any votes already cast by them,[6] as happened in *Kennedy*. Unlike the circumstances in *Harrington*, they have not brought this suit for guidance on general appropriations or potential impeachment proposals; their injury

is not a lack of unbiased information "bearing upon" their legislative roles.

Plaintiffs argue that their situation is more akin to that presented in *Kennedy* than in *Harrington*. The effectiveness of Senator Kennedy's vote was impaired by executive action taken after his vote was cast; the effectiveness of their votes has been aborted by Presidential action circumventing the role of the House. The difference in timing aside, plaintiffs claim that their disenfranchisement is equally as real and objective.

■ In essence, the House Members are asking the Court to interpret Article IV to mean that the House is entitled to vote on the same provisions concerning property disposition at the same time as the Senate. Such an interpretation would contradict the *Kennedy* standing requirement that a legislator must demonstrate interference with his official influence on the legislative process. Without attempting to usurp plaintiffs' legislative functions, the Court notes that they have been and are now free to introduce, consider and vote on legislation paralleling the Panama Canal Treaty, to determine if a majority of the House approves transfer of territorial sovereignty.[7] This approach is admittedly more difficult than voting on provisions submitted by the President to the House. However, since the issue is whether the President has usurped plaintiffs' constitutional right to vote, the comparative facility of different methods of voting is not determinative. Just as in *Harrington* and *Metcalf*, the fact that legislators have been hampered in their legislative functions is not sufficient to show a nonspeculative concrete injury in fact.

6. At the oral argument, counsel for plaintiffs suggested that the President's action undermined Congressional enactment of Article V of the 1955 Panama treaty, which provides for the transfer of certain real property to the Republic of Panama "subject to the enactment of legislation by the Congress." A legislator who voted for a statute which has been correctly enacted does not have standing on that basis alone to ensure enforcement of the legislation. *See Metcalf*, 180 U.S.App.D.C. at 40, 553 F.2d at 185; *Harrington v. Schlesinger*, 528 F.2d 455, 459 (4th Cir. 1975); *McRae v. Mathews*, 421 F.Supp. 533, 540 (E.D.N.Y.1976). The logic of

this rule, which serves to limit Congressional intervention in every case interpreting federal laws, applies to enacted treaties as well as statutes.

7. The Court is in no way implying that plaintiffs would have standing if the House had passed a resolution on the proper procedural role of the House or on the merits of Canal Zone territorial sovereignty transfer. *See* the discussion of institutional and derivative standing in *Harrington*, 180 U.S.App.D.C. at 54 n. 41, 553 F.2d at 199 n. 41.

Plaintiff Representatives apparently would distinguish *Harrington* on the grounds that Congressional information sources and CIA appropriations are matters more amenable to legislative control than disposition of Canal Zone property. They would point to the "shall vote" language of Article IV to protect their right to have the relevant provisions submitted to them by the President. Precedent, however, demonstrates that plaintiffs overestimate the importance of Article IV to their claims of standing.

This court rejected a similar claim based on Article IV in *Public Citizen v. Sampson*, 379 F.Supp. 662 (D.D.C.1974), *aff'd without opinion*, 169 U.S.App.D.C. 301, 515 F.2d 1018 (1975), where several Congressmen challenged General Services Administration (GSA) regulations which authorized agencies to grant rights to patents and inventions developed with federal funds. The court dismissed their complaint for lack of standing, finding that promulgation of the regulations did not cause an injury in fact to plaintiffs in their legislative roles, since it was "beyond peradventure that plaintiff Congressmen could tomorrow propose legislation regulating the contractual authority" of GSA. 379 F.Supp. at 667.

■ Admittedly, patents do not rival territorial sovereignty over the Panama Canal Zone in importance. However, an argument that the Court should not apply the holding in *Public Citizen* to this more consequential case proves too much, given that the sovereignty issues here owe their dramatic significance to the foreign policy context in which the case arises. This is not to say that interpretation of Article IV, where that Article allegedly conflicts with the President's treaty making powers, is a non-justiciable political question. Rather, considering that plaintiffs do have legislative avenues open to them in a situation rooted in international relations, the Court justifiably follows the precedent of *Public Citizen*

to find that plaintiffs have not demonstrated concrete injury in fact. Nor is the Court saying plaintiffs are not entitled to a judicial remedy because they can pursue alternative legislative solutions. Instead, because their official powers as Representatives remain undiminished in substance, they have not suffered a particularized, nonspeculative injury in their capacity as legislators. *See Metcalf*, 180 U.S.App.D.C. at 44 and n. 129, 553 F.2d at 189 and n. 129.

In a second relevant case, *Pressler v. Simon*,[8] Representative Larry Pressler alleged that two acts establishing procedures for adjusting Congressional pay rates, without the traditional requirement of specific legislation, violated the Article I, Section 6, cl. 1, requirement that Congressmen "shall receive a Compensation for their Services, to be ascertained by law." Before dismissing the case on the merits, the court found that Representative Pressler did not have an injury in fact for standing purposes at least until his salary had actually been adjusted by operation of the acts. Until that time, even though nonlegislative salary recommendations were imminent under the acts, any injury was "far too speculative" to support standing.

Plaintiff Representatives here allege a similarly speculative injury. True, like Representative Pressler, they have a legitimate interest in their alleged constitutional mandate to vote. However, the Court cannot focus on an impairment to that interest until exact contours of the injury are defined, until an event equivalent to the automatic adjustment in Representative Pressler's salary has occurred.

The President did submit the treaties to the Senate in September of 1977, thereby revealing his decision to bypass a House vote. However, many contingencies remain between submission and entry into force of the treaties. The House is free to vote on and perhaps approve property provisions parallel to those of the treaties. The Sen-

---

**8.** 428 F.Supp. 302 (D.D.C.1976) (three-judge court); *vacated and remanded for reconsideration in light of new legislation*, 431 U.S. 169, 97 S.Ct. 2162, 52 L.Ed.2d 216 (1977); *Order rein-stating prior opinion*, C.A. No. 76–782 (D.D.C. July 19, 1977); *dismissal aff'd*, —— U.S. ——, 98 S.Ct. 758, 54 L.Ed.2d 776 (1978).

ate may yet enact treaty amendments requiring full Congressional authorization for transfer of American property.[9] The Senate could disapprove the treaties or require amendments unacceptable to the Republic of Panama. Diplomatic problems could arise before or after exchange of instruments of ratification.

Postulating that these events will not come to pass, plaintiffs deny that a judicial opinion will be only advisory at this point in time. The Court is not prepared to second-guess the political contingencies inherent in the treaty making and legislative processes. Nor can the Court now assess plaintiffs' contention that ratification means a *fait accompli*, protected from judicial interference.

In short, the Court finds plaintiffs' injury too speculative to fulfill the injury in fact requirement of standing. A declaratory judgment on the constitutional right of the House to vote on the territorial sovereignty provisions would be abstract if the treaties met a political death in the House, the Senate or the executive branch. Insofar as plaintiffs' object to an actual transfer of American property without House approval, the listed contingencies grow in significance. *See Helms v. Vance*, No. 77–83 (D.D.C. Mar. 23, 1977), *aff'd mem.*, No. 77–1295 (D.C.Cir. May 3, 1977).[10]

### Summary and Conclusion

The sixty House Members have not suffered a concrete nonspeculative injury in fact to their right to vote on the Panama Canal treaties. Possible legislative solutions are still available to them, both before and after any Senate ratification. They

have not shown nullification of their official influence upon the legislative process. Further, the ultimate enactment of the territorial sovereignty provisions of the treaties is subject to many political contingencies, all unpredictable and uncontrollable by this Court. In the words of the Supreme Court,

> [t]o permit a complainant who has no concrete injury to require a court to rule on important constitutional issues in the abstract would create the potential for abuse of the judicial process, distort the role of the Judiciary in its relationship to the Executive and the Legislature and open the Judiciary to an arguable charge of providing "government by injunction."

*Schlesinger v. Reservists to Stop the War*, 418 U.S. 208, 222, 94 S.Ct. 2925, 2933, 41 L.Ed.2d 706 (1974).

Because plaintiffs have not met the "irreducible constitutional minimum" of a concrete injury in fact to their legislative roles, they do not have standing and no further inquiry is necessary. The Court lacks subject matter jurisdiction and the defendant's motion to dismiss must be granted.

Ordered accordingly.

---

**9.** Two such amendments were introduced in the Senate Foreign Relations Committee: Amendment No. 16 to Ex. N, 95–1 (Jan. 26, 1978); Reservation No. 2 to Ex. N, 95–1. These were both tabled. Report, *supra* note 4 at 123. They are, however, subject to reintroduction to the full Senate.

**10.** *Helms* was a similar suit brought by Congressmen before the President had submitted any treaties to the Senate. In an opinion dismissing the suit as premature, the Honorable Thomas Flannery considered the contingency of Senate ratification to be a ripeness factor.

In the instant case, as often happens in discussions of justiciability under Article III, this Court's finding that any injury to plaintiffs is too speculative for standing purposes overlaps with the ripeness doctrine.

The above discussion is equally applicable to plaintiffs' suggestion at oral argument that their right not to act with respect to disposition of American property in the Canal Zone is being injured. Any such injury will occur, if at all, only at the point in time when the property is actually transferred.