J. Reid POOVEY, et al., Plaintiffs,

v.

Rufus L. EDMISTEN, et al., Defendants.

No. 77-072-Civ-5.

United States District Court,
E. D. North Carolina,
Raleigh Division.

Aug. 20, 1981.

Hugh J. Beard, Jr., Charlotte, N. C., for plaintiffs.

J. LeVonne Chambers, Charlotte, N. C., Edwin M. Speas, Jr., Sp. Deputy Atty. Gen., Elizabeth C. Bunting, Asst. Atty. Gen., Raleigh, N. C., for defendants.

## MEMORANDUM OF DECISION

BRITT, District Judge.

This action in which plaintiffs seek to have North Carolina General Statute § 116–6, providing for the election and terms of members of the Board of Governors of the University of North Carolina, declared unconstitutional was instituted on 31 March 1977. It was brought under 42 U.S.C. § 1983 and Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d et seq.), with jurisdiction being asserted under 28 U.S.C. §§ 1331 and 1343. Under consideration is the motion of defendants to dismiss, based in part on the contention that plaintiffs lack standing to bring the action.

## PARTIES

The original parties plaintiff are:

1. J. Reid Poovey, a citizen of Catawba County, North Carolina, and a member of the North Carolina House of Representatives.

2. Anne N. Cochran and David Andrew Boone, citizens of New Hanover County, North Carolina.

3. Raymond Allen Warren,[1] a citizen of Mecklenburg County, North Carolina, and, at the time of the institution of the action, a student at the Wilmington Campus of the University.

The original parties defendant are:

1. Rufus L. Edmisten, Attorney General of North Carolina.

2. James B. Hunt, Jr., Governor of North Carolina.

3. James C. Greene, Lieutenant Governor of North Carolina.

4. Carl J. Stewart, Jr.,[2] then Speaker of the House of Representatives of North Carolina.

5. William A. Johnson,[2] then Chairman of the Board of Governors of the University of North Carolina.

6. The Board of Governors of the University of North Carolina, a body politic.

## BACKGROUND

Public education has always enjoyed a high priority in North Carolina, a state long acknowledged as a leader in Higher Education in both its public and private colleges and universities. The North Carolina Constitution makes reference to and provisions for education.[3]

From 1789 when the University of North Carolina (at Chapel Hill) was chartered until 1965 when the North Carolina School of the Arts began its operations, the state, through its elected representatives in the Legislature, has sought to provide for the educational needs of its citizens. As the state grew, new schools were established to ensure geographical balance. In Elizabeth City and Cullowhee—in Boone and Wilmington, campuses were made available for easy access of students. At a time when separate schools were provided for the different races six schools were chartered[4] for the Black and Indian citizens of the state. Accompanying the growth of the colleges and universities in size and prestige there

---

1. It is not clear whether Raymond Allen Warren is still a student. This makes no difference, however, in view of the disposition of the case as hereafter set forth.

2. The Court is aware that at the time of this opinion, neither Carl J. Stewart nor William A. Johnson still holds the office as alleged. This makes no difference, however, in view of the disposition of the case as hereafter set forth.

3. Art. I, § 15, Art. IX.

4. Elizabeth City State University
   Fayetteville State University
   North Carolina Agricultural and Technical State University
   North Carolina Central University
   Winston-Salem State University
   Pembroke State University
   All schools are referred to by their *present* names.

was increased competition for funding in the Legislature not only among the institutions themselves but also with other state agencies. To alleviate obvious problems which this caused, and for other reasons, a decision was made to consolidate all public institutions of higher learning. This was accomplished in 1971 when the General Assembly passed Chapter 1244 of the Session Laws of 1971.[5] The purpose of the Act as stated therein was

> ... [T]o foster the development of a well-planned and coordinated system of higher education, to improve the quality of education, to extend its benefits and to encourage an economical use of the State's resources ...

N.C.G.S. § 116-1.

Authority for governance and chain of command was established as follows:

A. a Board of Governors composed of thirty-two members to establish policy, plan, develop, coordinate and otherwise govern the system. N.C.G.S. § 116-11.

B. a President, chosen by the Board of Governors, to be the chief executive officer of the system and responsible for implementing the policies of the Board of Governors. N.C.G.S. § 116-14.

C. a Board of Trustees of each constituent institution consisting of thirteen members[6] charged with the duty of promoting "the sound development of the institution" under powers set forth in the Act and established by the Board of Governors. N.C.G.S. § 116-33.

D. a Chancellor of each constituent institution to be the executive and administrative head of the particular institution and "responsible for carrying out policies of the Board of

Governors and of the board of trustees." N.C.G.S. § 116-34.

The Act provided that the members of the original Board of Governors would be selected by the Board of Trustees of the constituent institutions from their membership.[7] As the terms of the original members of the Board of Governors expired, the Act provided that "their successors shall be elected by the Senate and House of Representatives." N.C.G.S. § 116-6. To provide for continuity of membership eight-year terms were established, one-fourth of which were to be filled at each biennial session of the Legislature beginning in 1973. The Act made the following provision for election of new members of the Board:

> The Senate and House of Representatives, in electing members of the Board of Governors, shall select from a slate of nominees made in a joint session of the General Assembly. There shall be nominated from the floor at least twice the number of persons as there are vacancies to be filled. The Senate and the House of Representatives shall elect one half of the persons necessary to fill the vacancies, with the Senate to hold its election prior to the House of Representatives. In the event that an odd number of members are to be elected, the House of Representatives shall select the additional nominee. In 1973 and every four years thereafter, the Senate shall elect at least one woman and one member of a minority race and the House of Representatives shall elect at least one member of the political party to which the largest minority of the members of the General Assembly belong. In 1975 and every four years thereafter, the Senate shall elect at least one member of the political party to which the largest minority of the members of the General Assembly belong and the House of Representatives shall elect

---

5. Codified as General Statute Chapter 116.

6. Eight trustees are elected by the Board of Governors and four are appointed by the Governor. The thirteenth member is the president of the student government who serves ex officio. N.C.G.S. § 116-31.

7. There were also two non-voting members chosen by the then existing Board of Higher Education to serve terms expiring on June 30, 1973. The Board of Higher Education was abolished by the same act that established the Board of Governors.

at least one woman and one member of a minority race.

Of the eight members elected every two years, at least one shall be a woman, at least one other member shall be a member of a minority race, and at least one other member shall be a member of the political party to which the largest minority of the members of the General Assembly belong. In subsequent elections to the Board, the General Assembly shall maintain at least these minimum proportions among the members of the Board.

N.C.G.S. §§ 116–6(d)–(e).

It is the provision for one member of a minority race out of every eight chosen that is under attack here.

## THE STANDING ISSUE

█ Article III, Section 2, of the Constitution delineates the limit to which the judicial power of Federal Courts extends. To meet that limitation a litigant must show that a "case or controversy" exists between himself and his adversary. *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

This is the threshold question in every federal case, determining the power of the court to entertain the suit.... [T]he standing question is whether the plaintiff has "alleged such a personal stake in the outcome of the controversy" as to warrant *his* invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf. *Id.* at 498–99, 95 S.Ct. at 2204–05. (emphasis by the Court)

█ To determine whether a litigant has "standing" in a given factual setting, a court must not only determine that he has met the constitutional limitation but must also consider certain prudential limitations. The alleged harm must be something other than a "generalized grievance" shared by most citizens and must affect the legal

rights and interests of plaintiff rather than someone else. *Id.* at 499, 95 S.Ct. at 2205.

"Essentially, the standing question ... is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Id.* at 500, 95 S.Ct. at 2205. Thus, to properly determine the standing issue we must consider the claims and the plaintiffs separately.

## THE EQUAL PROTECTION CLAIMS

█ Plaintiffs contend that N.C.G.S. § 116–6 violates the equal protection provisions of the Fourteenth Amendment both as to each of them individually and as to the classes each of them seek to represent.[8]

Plaintiffs Cochran and Boone allege that they are eligible for election to the Board of Governors. Interrogatory 11 of Defendants' First Set of Interrogatories asks "Have you ever advised any person that you are or were ready, willing and able to serve as a member of the Board of Governors of the University of North Carolina? ..." Plaintiffs Cochran, Boone and Warren answered "No." Poovey answered "No, but have been and now am ready, willing and able to serve."[9]

The only statutory requirement for membership on the Board is contained in N.C.G.S. § 116–7(a) which provides:

All members of the Board of Governors shall be selected for their interest in, and their ability to contribute to the fulfillment of, the purposes of the Board of Governors, and all members shall be deemed members-at-large, charged with the responsibility of serving the best interests of the whole State. In electing members, the objective shall be to obtain the services of the best qualified citizens of the State, taking into consideration the need for representation on the Board by

---

8. No determination has been made of the requests for class certification.

9. Poovey is ineligible to serve, as N.C.G.S. § 116–7(b) prohibits service on the Board by members of the General Assembly.

the different races, sexes and political parties.[10]

All that is necessary to become nominated is to have one's name placed in nomination by a member of the Legislature. There are 120 representatives and 50 senators in the North Carolina General Assembly. There is no limit on the number of persons that a senator or representative may nominate. Plaintiffs have alleged no harm different from that allegedly suffered by all other citizens of the entire State of North Carolina. "A federal court's jurisdiction ... can be invoked only when the plaintiff himself has suffered 'some threatened or actual injury resulting from the putatively illegal action....'" *Warth v. Seldin, supra* at 499, 95 S.Ct. at 2205.

This Court holds that in order to have standing to mount an equal protection challenge to the statute in question a plaintiff must allege at a minimum that he or she has been nominated but not elected, or refused nomination, because of discrimination. Plaintiff Warren's status as a student does not improve his standing relative to the equal protection claim.

Plaintiffs contend that they have standing under the decision of the Supreme Court in *Regents of the University of California v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). That decision is easily distinguishable, as Bakke was an applicant for membership in the medical school class whose admission policies were being challenged. By being unable to compete for all openings solely because of his race, Bakke was able to show an injury likely to be redressed by a favorable decision of his claim. This contrasts with plaintiffs here whose alleged injuries were neither real nor immediate; they are, rather, conjectural and hypothetical. *See Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Golden v. Zwickler*, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969); *Jackson v. Dukakis*, 526 F.2d 64 (1st Cir. 1975).

Plaintiff Poovey asserts that he has standing because of his status as a member of the North Carolina Legislature, contending that he is compelled to vote for certain members of the Board of Governors solely on the basis of race and that he is denied the opportunity of nominating persons of his choice to the seats designated for minority members. He frankly concedes, however, that he has been able to find no case law supporting his position.

█ A legislator whose vote has actually been nullified has standing to challenge the action that has led to the nullification. *Coleman v. Miller*, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939). *Coleman* was an action brought by twenty-one Kansas state senators. The Kansas Legislature, in considering an amendment to the United States Constitution known as the Child-Labor Amendment, divided evenly in its vote. The lieutenant governor, as presiding officer of the Senate, then cast his vote in favor of the resolution. The Court held that the state senators who had voted against ratification of the amendment had standing to challenge the legality of the tie-breaking vote.

The reasoning in *Coleman, supra*, was followed in *Kennedy v. Sampson*, 511 F.2d 430 (D.C.Cir.1974) in which Senator Edward M. Kennedy of Massachusetts asked the Court to declare that the Family Practice of Medicine Act became law on 25 December 1970. The Act was passed in both the House and the Senate in the fall of 1970 and was presented to the President on 14 December 1970. On 22 December 1970 both Houses of Congress adjourned for the Christmas holidays, and on 24 December 1970 the President issued a memorandum of disapproval announcing that he would withhold his signature from the Act. Senator Kennedy alleged that this series of events resulted in a pocket veto and that the bill became law without the President's signature at the expiration of the ten-day period

---

**10.** Subsection (b) of N.C.G.S. § 116–7 lists disqualifications. In addition to members of the General Assembly, previously noted, the following are also disqualified from membership: an officer or employee of the State, or of any constituent institution, or their spouse.

following its presentation to him. The Court found that Senator Kennedy had standing because he had alleged that conduct by officials of the Executive Branch amounted to an illegal nullification, not only of Congress' exercise of its power, but also of Senator Kennedy's exercise of his power, and that the object of the lawsuit was to vindicate the effectiveness of Senator Kennedy's vote.

*Edwards v. Carter*, 445 F.Supp. 1279 (D.D.C.), *aff'd* 580 F.2d 1055 (D.C.Cir.), *cert. denied*, 436 U.S. 907, 98 S.Ct. 2240, 56 L.Ed.2d 406 (1978), involved a treaty signed by President Carter that would transfer some real property in the Canal Zone from the United States to the Republic of Panama. Plaintiffs, sixty members of the House of Representatives, requested the Court to issue a declaratory judgment that the President's actions deprived the United States of the property without the prior concurrence of the entire Congress, thereby thwarting them in the performance of their duties as directed by the Constitution. The treaty was submitted only to the Senate. Finding that plaintiffs did not have standing, the Court stated that:

> Where a legislator's "official influence upon the legislative process" is not impaired by alleged illegality, though one channel of power or source of information may be hampered, he has no standing to entangle the federal court in his general legislative difficulties. A legislator in the *Kennedy* type case has standing, however, where the court can limit its inquiry to the "discrete aspect" of the process by which a bill becomes law, meaning the original vote and post-enactment events denying a bill's legal status. *Id.* at 1283.

In *Goldwater v. Carter*, 617 F.2d 697 (D.C.Cir.), *vacated* 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979), the Court stated that:

> In our decisions on congressional standing this court has carefully drawn a distinction between (1) a diminution in congressional influence resulting from an Executive action that nullifies a specific congressional vote or opportunity to vote, in an objectively verifiable manner—which, we have found, constitutes injury in fact; and (2) a diminution in a legislator's effectiveness, subjectively judged by him or her, resulting from Executive action withholding information or failing to obey a statute enacted through the legislator's vote, *where the plaintiff-legislator still has power to act through the legislative process to remedy the alleged abuses* —which situations we do not find injury in fact. To be cognizable for standing purposes, the alleged diminution in congressional influence must amount to a disinfranchisement, a complete nullification or withdrawal of a voting opportunity; ... *Id.* at 702. (emphasis added)

Under these cases a legislator has standing to sue when he alleges that the Executive Branch illegally nullified his vote. Poovey's allegations do not involve any action by the Executive Branch. Instead, any infringement on Poovey's ability to vote for anyone he wishes to serve on the Board of Governors was made by the Legislature itself in passing N.C.G.S. § 116–6.

■ Emerging from the review of these cases is the principle that legislators have standing to challenge executive actions when specific powers unique to their functions under the constitution are diminished or interfered with.

Poovey's remedy for his dissatisfaction with the method of selecting the Board of Governors is to introduce a bill in the North Carolina General Assembly seeking the repeal of N.C.G.S. § 116–6. As Justice Frankfurter said in his dissenting opinion in *Coleman, supra* 307 U.S. at 465, 59 S.Ct. at 987, contending that the legislators there did not have standing, "By as much right could a member of the Congress who had voted against the passage of a bill because moved by constitutional scruples urge before this Court our duty to consider his arguments of unconstitutionality."

■ Should the Federal Courts entertain suits by legislators in such situations as this, any legislator would have two forums—the

Legislative and Judicial—in which to test his theories of constitutionality. Additionally, neither the significance nor the magnitude of the question presented improves the standing of a litigant. Thus, the fact that the statute here in question was enacted by the North Carolina General Assembly before the decision of the Supreme Court in *Bakke, supra,* and that the *facts* alleged herein raise very serious questions of constitutionality do not remedy the deficiencies in the standing of the *named* plaintiffs to bring this action.

Again, Justice Frankfurter expressed it best in his dissent in *Coleman v. Miller*:

It is not our function, and it is beyond our power, to write legal essays or to give legal opinions, however solemnly requested and however great the national emergency.... Unlike the role allowed to judges in a few state courts and to the Supreme Court of Canada, our exclusive business is litigation. The requisites of litigation are not satisfied when questions of constitutionality though conveyed through the outward forms of a conventional court proceeding do not bear special relation to a particular litigant. The scope and consequences of our doctrine of judicial review over executive and legislative action should make us observe fastidiously the bounds of the litigious process within which we are confined. No matter how seriously infringement of the Constitution may be called into question, this is not the tribunal for its challenge except by those who have some specialized interest of their own to vindicate, apart from a political concern which belongs to all.

307 U.S. at 462–64, 59 S.Ct. at 986.

### THE FEDERAL TAX CLAIMS

As noted, plaintiffs also allege causes of action under 42 U.S.C. § 2000d.[11] The only way plaintiffs Poovey, Cochran and Boone can attack N.C.G.S. § 116–6 as violating 42 U.S.C. § 2000d is through their status as federal taxpayers. To have such standing they must (1) allege the unconstitutionality of exercises of congressional power under the taxing and spending clause of Article I, Section 8, of the Constitution; and (2) show that the alleged enactment exceeds specific constitutional limitations imposed upon the exercise of congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Article I, Section 8. *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). Poovey, Cochran and Boone fail to meet either prong of this test. They do not allege that by the enactment of 42 U.S.C. § 2000d there was an unconstitutional exercise of congressional power nor do they allege that the appropriation of funds to the University exceeds specific constitutional limitations imposed upon the exercise of congressional taxing and spending power.

Plaintiff Warren's status as a student does not place him in any better position. He is not challenging any specific university program or activity nor has he alleged specific facts detailing how he has been denied the benefits of or subjected to discrimination under any university program or activity.

In addition, none of the plaintiffs have stated a cause of action under 42 U.S.C. § 2000d.

Finding that none of the plaintiffs have standing to challenge N.C.G.S. § 116–6 upon any of the grounds set forth in the Amended Complaint, the motion of defendants to dismiss is ALLOWED.

SO ORDERED.

---

**11.** "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."